Louis DANNA, Robert F. Esler, and all others similarly situated, Plaintiffs,

v.

AIR FRANCE et al., Defendants.

No. 71 Civ. 3648.

United States District Court, S. D. New York.

Nov. 15, 1971.

———◆———

LoFrisco, Gallagher & Kenny, Gold, Farrell & Marks, New York City, for plaintiffs, by Thomas R. Farrell, Martin R. Gold, Leonard M. Marks, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for Air France, by Carroll E. Dubuc, New York City, of counsel.

Condon & Forsyth, New York City, for Boac, Air-India, Quantas, by George N. Tompkins, Jr., New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Pan American, Japan Air Lines, by James C. Blair, New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for Trans World Airlines, Inc. by Harold L. Warner, Jr., New York City, of counsel.

Hill, Betts & Nash, New York City, for Olympic by Benjamin E. Haller, New York City, of counsel.

GURFEIN, District Judge.

This is a purported class action which raises the question of whether the so-called Youth Fares initiated by the defendant airlines are in violation of the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301–1542. Jurisdiction is invoked under 28 U.S.C. § 1337 in that the action

arises under an Act of Congress regulating commerce, namely, 49 U.S.C. § 1374.

The complaint, filed on August 17, 1971, alleges two claims for relief. The first claim, on behalf of plaintiff Louis Danna and all others similarly situated, is alleged against defendants Air France, Pan American World Airways, Inc. (PAA), Trans World Airlines, Inc. (TWA), and Olympic Airways, S.A.

The second claim on behalf of plaintiff Robert F. Esler and others similarly situated, is alleged against defendants British Overseas Airways Corporation (BOAC), PAA, TWA, Japan Airlines Company Ltd., Air-India, and Qantas Airways Ltd.

In essence, both claims are based on the so-called "Youth Fares," allegedly in effect since June of 1971 and pursuant to which the defendants, for air carriage on certain flights, charge lower fares to persons falling within specified age groups than they charge to those not falling within such age groups. The first claim in the complaint relates to the "Paris Youth Fare," pursuant to which the fare for round-trip economy class for one person between New York City and Paris, France is allegedly $200 plus $3 tax (or $220 plus tax during June, July and August) for persons between 15 and 25 years old, inclusive.[1] It is alleged that, for persons older than 25, the fare for one person for the same round-trip economy class flight is $596 plus $3 tax. The second claim in the complaint relates to the so-called "London Youth Fare," pursuant to which the fare for round-trip economy class for one person between New York and London is allegedly $100 plus tax (or $210 plus tax during June, July and August) for persons between 12 and 25 years old, inclusive. It is alleged that for persons older than 25, the fare for one person for the same round-trip economy class flight is $552 plus tax.

Danna, the plaintiff in the first claim, alleges that he sought to purchase from each of the first claim defendants a ticket for round trip between New York and Paris at the lower fare; that he was refused by reason of his being over the age limit; and that he then purchased a ticket at the higher fare from defendant Air France. Esler, the plaintiff in the second claim, makes substantially the same allegations respecting efforts to purchase a ticket for round trip between New York and London at the lower fare from the second claim defendants, and further alleges that he then purchased a ticket at the higher fare from defendant BOAC.

Plaintiff Danna alleges that he is a member of a class of persons exceeding 50,000, each of whom is not within the age group to which the Paris Youth Fare applies and each of whom has consequently paid in excess of the Paris Youth Fare for round trip economy class air passage between New York and Paris. It is claimed that plaintiff Danna and each member of the purported class have been damaged to the extent of the difference in the fares. Plaintiff Esler makes substantially the same allegations with respect to the London Youth Fare, and purports to act for another class of persons exceeding 50,000.

The fare differential and the estimated size of the class affected results in claimed damages of twenty million dollars on each of the two claims, for an aggregate of forty million dollars, plus interest, costs, disbursements and a reasonable attorneys' fee.

The complaint charges that the defendants each violated Federal Aviation Act § 404(b), 49 U.S.C. § 1374(b), which reads as follows:

"(b) No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect

---

1. Some airlines have somewhat different age limits than indicated in the text, on both the Paris and London routes.

whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The allegation is that each member of the class who was outside the age group eligible for the Youth Fare was, by virtue of being required to pay more for the same service, subjected to an "unjust discrimination" and an "undue or unreasonable prejudice or disadvantage." Concomitantly, it is alleged that those eligible for the Youth Fare were given an "undue or unreasonable preference or advantage."

In a series of six motions now before this Court, all the defendant airlines move to dismiss the complaint upon the ground that it fails to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b) (6).[2] The plaintiffs also move for a determination that this action may be maintained as a class action and for a delineation of membership of the class.

The defendants' contentions, particularly as made by PAA, are the following:

(1) the claim that discrimination or preference in an air carrier's field fares constitutes a violation of the above-quoted § 404(b) of the Federal Aviation Act is within the primary jurisdiction of the Civil Aeronautics Board (CAB); (2) even if the CAB, in the exercise of its primary jurisdiction, finds that such fares do violate § 404(b), no private action exists for the charging of such fares during the period before such CAB determination; and (3) even if such private right of action did exist, it would be maintainable only by one who has sustained a private injury by reason of the violation of § 404(b), and, as a matter of law, the mere paying of a higher fare than that paid by someone else for the same flight is not a private injury giving rise to a claim.

The plaintiffs, on the other hand, contend: (1) that there is no primary jurisdiction in the CAB, as is evidenced by the assumption of jurisdiction by the Federal courts in cases involving alleged violations of § 404(b); (2) that there is a private right of action for damages for past unjust discriminations and preferences; and (3) that the plaintiffs have been damaged by the defendants' preferential discounts and unjust discriminations, in that the plaintiffs have been compelled to pay discriminatorily higher rates for the same service and are in effect subsidizing Youth Fare passengers and the airlines. As a further source of damage, they urge in argument[3] that the defendants have committed a breach of an implied contract that the plaintiffs would not pay more than other passengers for the same service and that the fares charged would be lawful. The plaintiffs contend, moreover, that the fact that the Youth Fare rates were filed with the CAB is irrelevant because no unjustly discriminatory or unduly preferential rate can be lawful, filed or not, and that mere filing does not signify acceptance or approval of the rate by the Board. Finally, it is urged, the U. S. carriers cannot defend upon the ground that they had to match foreign competition for they could have sought injunctive relief instead of willingly participating in the discrimination and preference.

Section 403 of the Federal Aviation Act, 49 U.S.C. § 1373, provides in part:

"(a) Every air carrier[4] and every foreign air carrier[5] shall file with the Board, and print, and keep open to

---

2. Some defendants also move to dismiss on the ground that the Court lacks jurisdiction over the subject matter. Fed.R.Civ. P. 12(b) (1).

3. This would be a common law claim which is not pleaded; nor is diversity of citizenship alleged or pendent jurisdiction claimed.

4. "Air carrier" is defined in § 101(3), 49 U.S.C. § 1301(3), as meaning a U. S. citizen who undertakes to engage in air transportation.

5. "Foreign air carrier" as defined in § 101(19), 49 U.S.C. § 1301(19), as meaning a non-U. S. citizen who undertakes to engage in foreign air transportation.

public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it, and between points served by it and points served by any other air carrier or foreign air carrier when through service and through rates shall have been established, and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. Tariffs shall be filed, posted, and published in such form and manner, and shall contain such information, as the Board shall by regulation prescribe; and the Board is empowered to reject any tariff so filed which is not consistent with this section and such regulation. * * *

(b) No air carrier or foreign air carrier shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares and charges specified in its currently effective tariffs. * * * "

The Court will take judicial notice that the tariffs filed under § 403 actually showed the Youth Fare charged to that age group as well as the higher rates charged to the plaintiffs. There is no claim that there was an "overcharge" on any particular filed rate. The defendants evidently charged each category of passengers the exact fare as filed for that category in currently effective tariffs. The mischief suggested, in the claim of plaintiffs, is not that the defendants departed from their tariffs, or even that the regular economy round-trip fare to Paris and London was unreasonably high, but rather that the existence of the Youth Fare constituted an unjust discrimination, preference and prejudice.

The CAB has the power to correct filed rates if they amount to discrimination, preference or prejudice. § 1002(a)

of the Federal Aviation Act, 49 U.S.C. § 1482(a), provides that any person may file a complaint with the CAB "with respect to anything done or omitted to be done" in contravention of any provision of the Act or the regulations promulgated thereunder. The Board is empowered, as well, to institute an investigation "on its own initiative" § 1002(b), 49 U.S.C. § 1482(b).

Section 1002(f), 42 U.S.C. § 1482(f), provides:

"(f) Whenever, after notice and hearing, upon complaint, or upon its own initiative, the Board shall be of the opinion that any individual or joint rate, fare, or charge demanded, charged, collected, or received by any air carrier or foreign air carrier for foreign air transportation,[6] or any classification, rule, regulation, or practice affecting such rate, fare, or charge, or the value of the service thereunder, is or will be unjustly discriminatory, or unduly preferential, or unduly prejudicial, the Board may alter the same to the extent necessary to correct such discrimination, preference, or prejudice and make an order that the air carrier or foreign air carrier shall discontinue demanding, charging, collecting, or receiving any such discriminatory preferential, or prejudicial rate, fare, or charge or enforcing any such discriminatory, preferential, or prejudicial classification, rule, regulation, or practice."

The scheme of the statute gives no power to the Board to refuse to accept the filing of a tariff for foreign air transportation, if the filing is formally proper. Nor has it any statutory authority to prevent the fares of that tariff from becoming effective. Only after "notice and hearing" may any fare be found to be "unjustly discriminatory" or "unduly preferential" or "unduly prejudicial." And only upon such finding may the Board alter the fare to the ex-

---

6. "Foreign air transportation" is defined in § 101(21), 49 U.S.C. § 1301(21), to mean air transportation between a place in the United States and any place outside thereof.

tent necessary to correct such discrimination [7] and order that "the air carrier or foreign air carrier shall discontinue * * * collecting * * * any such discriminatory * * * fare * * * "

It appears, then, that this subsection 1002(f), which bears the heading "Removal of discrimination in foreign air transportation," is limited solely to the prevention of future discrimination. It says nothing concerning the remedying of discrimination found to have occurred between the original filing of the tariff and the date the Board finds the particular fare to be discriminatory. Moreover, the Congress, in enacting a complex regulatory scheme for the foreign air transportation industry, seems to have made no provision for halting what may be grossly unreasonable or prejudicial rates before they can become effective. By the same token, the permission to file the tariff may not be construed as acquiescence on the merits by the CAB, for it had no power to reject.

When this action was commenced, the CAB had taken no action on the Youth Fare. Since then, the CAB has ordered an investigation of international student and youth fares applicable to U. S. residents in foreign air transportation (Order 71–9–3; Sept. 1, 1971; Docket 23780).[8] As the order of investigation shows, the CAB will itself investigate [9] whether the precise Youth Fares which are the subject of the action in this Court are unjustly discriminatory and, therefore, unlawful under § 404(b) of the Act.

■ With this factual and statutory background, we can now turn to the threshold question of whether the issue of discriminatory rates under § 404(b) is a proper subject for initial judicial inquiry, even though a straightforward determination of whether a rate is in itself unreasonable would not be. See Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 448, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907). There the Court said:

"* * * that a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable. * * * "

See also Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951); Lichten v. Eastern Airlines, 189 F.2d 939 (2 Cir. 1951) (involving reasonableness of an airline tariff). If the issue of rate "discrimination" is no different in kind from the issue of rate "unreasonableness" there is little doubt that the doctrine of primary jurisdiction would come into play, inhibiting judicial action at least until the Board has spoken and been reviewed by a U. S. Court of Appeals.

On the absence of any such distinction the Supreme Court has written, in Robinson v. Baltimore & O. R. R., 222 U.S. 506, 511, 32 S.Ct. 114, 116, 56 L.Ed. 288 (1912):

"It is true, as was urged in argument, that in that [*Texas & Pac. Ry.*] case the complaint against the established rate was that it was unreasonable, while here the complaint is that

---

7. Although the complaint alleges preference, advantages, prejudice and disadvantages, in addition to discrimination, all such alleged violations of § 404(b) are sometimes referred to herein under the generic term "discrimination," because the distinction among these terms is of no significance in deciding these motions.

8. The CAB has received many passenger complaints, as well as a complaint from the National Air Carrier Association. The United States Department of Transportation, it is disclosed in the order, opposes both the youth and student fares, *inter alia*, "on the grounds of unjust discrimination."

9. The investigation will be pursuant to §§ 204(a), 1002(f), 49 U.S.C. §§ 1324(a), 1482(f).

the rate was unjustly discriminatory. But the distinction is not material. The power of the Commission over the two complaints is the same,—one is as likely to become the subject of diverging opinions and conflicting decisions as is the other, and if a court, acting originally upon either, were to sustain it and award reparation, the confusing anomaly would be presented of a rate being adjudged to be violative of the prescribed standards and yet continuing to be the legal rate, obligatory upon both carrier and shipper."

For cases of both unreasonableness and discrimination, the need for uniformity of regulation argues for invoking the doctrine of primary jurisdiction, unless one were prepared to say, in absolutist fashion, that *any* differential in rates for the same service is *per se* illegal. While there is perhaps a lesser need for expertise in determining whether a discrimination is justified than in performing the difficult cost allocations involved in a determination of reasonableness, we have here, on the other hand, the additional element of foreign relations. Some of the considerations involved in foreign air transportation have been thought so political in nature that final decision has, in fact, been vested in the President himself. See §§ 801, 1110, 49 U.S.C. §§ 1461, 1510. Furthermore, the judiciary must dread an anomaly such as that described in *Robinson;* this would result if the CAB should decide that the tariffs were not unjustly discriminatory and this Court should hold the opposite, or vice versa. Finally, the language of § 1002(f), which gives the Board jurisdiction to alter fares in for-

eign air transportation, for the particular reason that they are "unjustly discriminatory," is strong evidence that the Congress intended to vest the power to determine this issue initially in the Board and not in the Federal courts. Therefore, the determination of whether a discrimination is unjust is a proper case for the recognition of the primary jurisdiction of the CAB, making such matter unripe for any judicial action at least until there has been a prior administrative hearing and determination.[10]

But, say the plaintiffs, this line of argument overlooks the circumstance that the power of the CAB is limited to preventing future harm, for, as we have seen, the Board may not give reparation for harm already done. It cannot be, they argue, that, if a wrong has been done which cannot be redressed by the Board, that agency still retains exclusive primary jurisdiction. And in support they cite Fitzgerald v. Pan American World Airways, Inc., 229 F.2d 499, 502 (2 Cir. 1956),[11] where the Court observed:

"As such an order [by the CAB] must look to the future, obviously it cannot afford redress to one harmed by a violation of Section [404(b)]."

The Court, therefore, permitted the action in *Fitzgerald* to lie without reference to the CAB because:

"(1) The Civil Aeronautics Act, unlike the Interstate Commerce Act,[12] or the Shipping Act,[13] confers no power on the administrative agency to grant reparation in money for past misconduct of the carrier. (2) The Board has no power to approve violations of

---

10. The Court of Appeals for the Fifth Circuit in Transcontinental Bus System, Inc. v. CAB, 383 F.2d 466, 489 (1967), cert. denied, 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968), did come close to saying as a matter of law "that 'age alone is * * * not a relevant consideration" in fixing rates. Nevertheless, the Court remanded the question to the CAB for further consideration. The question of whether the passenger would have

a private right of action was not before the Court.

11. The *Fitzgerald* case involved a claim by three Negroes that they had been refused transportation, although they had confirmed reservations, because of racial discrimination. There was no question of rate discrimination.

12. 49 U.S.C. §§ 9, 13(1).

13. 46 U.S.C. § 821.

Section [404(b)]. (3) Nor has it purported to do so."

The rationale of the Second Circuit was substantially that there is no right without a remedy and since the Board could not give the remedy, a Court must. The suggestion that there might be only a State common law remedy was dismissed upon the ground that the Federal statute implied a right of action. Such was the decision of the Second Circuit in 1956.

In 1959, T. I. M. E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952, was decided. There the point that had motivated the Second Circuit—the absence of an administrative remedy for past unlawful conduct by the carrier—came to the fore again. Only this time the result reached was contrary. The Supreme Court in that case had the choice of saying either: (1) that where the Congress has not given the agency power to right past wrongs by awarding damages, such power must rest in the courts; or (2) that in such case, Congress may have intended that redress for such past wrongs should not be available *anywhere.* The Supreme Court chose the latter alternative as the correct one.

The *T.I.M.E.* case arose under the Motor Carrier Act (49 U.S.C. §§ 301–327) which then had no provisions similar to those contained in the Interstate Commerce Act, 49 U.S.C. §§ 8, 9, 13(1) and 16, authorizing the Commission "to grant reparation in money for past misconduct of the carrier," to use Judge Frank's words in *Fitzgerald.* In this re-

spect, at least, the Federal Aviation Act is like the Motor Carrier Act which was before the Supreme Court in *T.I.M.E.*[14]

In *T.I.M.E.*, two interstate motor carriers had sued the Government, as shipper, for unpaid transportation charges which the Government had refused to pay on the ground that the filed tariffs of the motor carriers had been unreasonable. In each of the two cases, the Court of Appeals had directed a referral to the I.C.C. on the issue of the reasonableness of the rate in question. The Government urged, first, that the statutory mandate that the carrier establish "just and reasonable rates"[15] imposed a duty not to collect other than "reasonable" rates and that a cause of action on behalf of shippers and a defense to payment was, therefore, implied. The Court rejected that argument on the authority of Montana-Dakota Utilities Co. v. Northwestern Public Service Co., *supra,* a case holding that the Federal Power Act, which like the Motor Carrier Act[16] expressly delares unreasonable rates to be "unlawful," does not create a cause of action for the recovery of allegedly unreasonable *past* rates.[17] The second argument of the Government, that the I.C.C. be permitted to pass on the reasonableness of the rate "as an adjunct" to a judicial proceeding for the enforcement of a common law right to recover unreasonable past charges, was also rejected, on the ground that no such common law right survived the passage of the Motor Carrier Act. In sum, it was concluded that no action by the shipper would lie.

14. Judge Friendly in Vogelsang v. Delta Air Lines, Inc., 302 F.2d 709, 713 n. 5 (2 Cir.), cert. denied, 371 U.S. 826, 83 S.Ct. 46, 9 L.Ed.2d 65 (1962) said: "The *T.I.M.E.* case arose under the Motor Carrier Act, on which * * * the Civil Aeronautics Act was largely patterned."

15. 49 U.S.C. § 316(b).

16. 49 U.S.C. § 316(d). The Federal Aviation Act does not even go so far as to declare expressly that unreasonable or discriminatory rates are unlawful.

17. The Court there had declined to permit the Federal Power Commission to take

a reference on unreasonableness, because the Congress had not given it a statutory mandate to grant reparations for unreasonable rates collected in the past and because the District Court had no jurisdiction either to grant such reparations.

It is interesting that Mr. Justice Frankfurter, who had dissented in *Montana-Dakota,* was with the majority in *T.I.M.E.*, holding that no private action could be implied by the Motor Carrier Act in spite of its failure to allow the I.C.C. itself to award reparations to shippers by motor carrier because of past unreasonable rates.

On its face, the rationale of *T.I.M.E.* would appear to dispose of this case. But there are two distinctions that can be taken. First, in replying to the contention that the majority opinion in *T.I.M.E.* would "sanction injustice," Mr. Justice Harlan noted that, under the procedures of the Motor Carrier Act, the carrier could not raise his rates except on 30 days' notice and the I.C.C. could suspend the effectiveness of the proposed rate for an additional seven months while its reasonableness is scrutinized (359 U.S. at 479–480, 79 S.Ct. 904, 3 L.Ed.2d 952), leaving the carrier, rather than the shippers, at a disadvantage for the interim period if the rate is ultimately found reasonable. That is not so under the Federal Aviation Act where, as we have seen, the filed rate for foreign air transportation cannot be suspended,[18] and it is the passenger who suffers in the interim period if the rate is ultimately found unreasonable or discriminatory.

The second distinction that may be made is that the language of the "saving clause" in the Motor Carrier Act is narrower than the language in the Federal Aviation Act. In the former, the saving clause read:

"Nothing in this section shall be held to extinguish any remedy or right of action not inconsistent herewith."[19]

In the latter, it reads:

"Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."[20]

I shall deal with the second distinction first. The words "not inconsistent here-with" in the Motor Carrier Act were a redundancy, since a similar limitation must be placed upon any statute that regulates an industry with regard to rate-making. It is not likely that the Congress would legislate a scheme under Federal agency aegis, aiming at uniformity, and at the same time permit the survival of State common law rights inconsistent therewith. That was the holding in Texas & Pac. Ry. v. Abilene Cotton Oil Co., *supra*, where it was determined that a shipper could not sue a railroad carrier for an allegedly unreasonable charge based on filed tariffs, because the common law right was extinguished, as absolutely inconsistent with the scheme of the Interstate Commerce Act. It should be noted that the "saving" provision in the ICA as it then stood was virtually *in haec verba* the language later adopted by the Congress in the "saving clause" of the Federal Aviation Act of 1958.[21] It is clear, therefore, that the Act of 1958 had engrafted on to it, at least presumptively, the gloss of *Abilene* with which the Congress was familiar. I conclude that the second distinction mentioned above is not a distinction of substance.

The plaintiffs also argue that the aforementioned first distinction, which is based on the greater powers of the I.C.C. with regard to rates, is sufficient to preclude the application of the twin holding of *T.I.M.E.*—that no Federal right is to be implied from the Motor Carrier Act and no common law right survives it—to the Federal Aviation Act. Looking first to the possibility of implying a Federal right of action, the question remains, even after noting the lesser powers of the CAB, whether it is for the Court or for the Congress to cre-

---

18. Although the Federal Aviation Act does provide for 30 days' notice ordinarily (§ 403(c), 49 U.S.C. § 1373(c)), the CAB waived this requirement in this case "in the public interest" so that the carriers could meet their competition.

19. 49 U.S.C. § 316(j).

20. Federal Aviation Act § 1106, 49 U.S.C. § 1506.

21. T.I.M.E., Inc. v. United States, 359 U.S. at 473 n. 13, 79 S.Ct. at 910, 3 L.Ed.2d 952:

"Section 22 of the Interstate Commerce Act provided at the time of the *Abilene* case, and continues in substance to provide, that: 'Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies.'"

ate rights of action in order not to "sanction injustice." The Federal Aviation Act has been on the statute books since 1958. *T.I.M.E.* was decided in 1959. Its rationale as applied to aviation was quite clear. Yet, the Congress through the years has not seen fit to amend the Federal Aviation Act, as it did the Motor Carrier Act,[22] to give courts the power to award monetary compensation for past unlawful acts, despite the fact that the CAB has repeatedly drawn the attention of the Congress to the lack of this power.[23]

The plaintiffs argue that the implication from the Congressional action on motor carriers is quite different. The Congress knew, it is said, that *T.I.M.E.* was a square holding on the Motor Carrier Act and that, therefore, justice required its amendment; but the Court had never decided similarly on the Aviation Act, therefore impliedly allowing a right of action and obviating the need for an amendment.[24] In support of this position that *T.I.M.E.* does not extend to the Aviation Act, plaintiffs cite *Fitzgerald, supra*; Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal. 1961); and Mortimer v. Delta Air Lines, 302 F.Supp. 276 (N.D.Ill.1969). These cases did allow recovery for discriminatory acts against the particular plaintiff. None of them was, however, a case involving fares and certainly not *filed* tariffs. *Fitzgerald*, as we have seen, involved racial discrimination; *Wills* and *Mortimer* similarly involved a refusal to

honor a passenger's confirmed reservation, though without racial overtones. In each of these cases, the defendant airline did something which was contrary to its accepted duty, and which could in no event result in any administrative action other than prospective sanctions against it. But no initial determination that any existing discrimination was unjustifiable within the economic pattern of the industry was necessary in those cases. That type of case does not impinge upon the uniform regulation entrusted to the CAB and, therefore, poses a proper situation for implying a Federal right of action.[25]

On the other hand, the question of whether a fare is unreasonable, discriminatory or preferential, can only be seen in the context of the large public interest, the relations with foreign governments,[26] the economic impact upon the carriers, and the requirements of competition, among other factors.[27] It is not the kind of determination that should desirably be made by a court or jury. The Congress, to be sure, could provide for such actions and the Federal courts would then accept such claims for relief. The question here is whether, in the face of Congressional silence following the decision in *T.I.M.E.*, a private right of action may be implied for alleged violation of § 404(b) where the claim is that a discriminatory fare was charged pursuant to an effective, filed tariff. The Second Circuit, in an opinion by Chief Judge Friendly, has specu-

22. 79 Stat. 651 (1965) ; 49 U.S.C. §§ 304a (2), (5), 1006a(2), (5).

23. See Annual Report of the CAB 69–70 (1964) ; *id.* 62 (1963).

24. The Congress apparently did not consider, when it was amending the Motor Carrier Act, the holding of *T.I.M.E.* as applied to the Federal Aviation Act.

25. *Fitzgerald* preceded the *T.I.M.E.* case and the later opinions do not mention *T.I.M.E.*

26. In fact, since the denial to the CAB of the power to suspend tariffs for foreign air transportation (although it has that power for domestic tariffs, 1002(g), 49

U.S.C. § 1482(g)) was undoubtedly motivated by fears of interference with foreign relations, it is an odd argument which urges that this absence of CAB power justifies the less expert courts in stepping in.

27. This broad statement, concededly, may not be in accord with the generalizations of the Fifth Circuit in the *Transcontinental Bus System* case, *supra*, note 10; but whatever the correct factors may be, the Fifth Circuit did remand to the CAB for its "consideration." Moreover, *Transcontinental* involved *domestic* fares which may involve somewhat less complicated factors than foreign air travel.

lated that "retrospective invalidation of a tariff properly filed with the Board may well be precluded in the light of the Supreme Court's subsequent decision * * * in *T.I.M.E.* * * *." Vogelsang v. Delta Air Lines, Inc., 2 Cir., 302 F.2d 709, 713, cert. denied, 371 U.S. 826, 83 S.Ct. 46, 9 L.Ed.2d 65 (1962).[28]

It is true that the implication of civil claims for liability under Federal statutes, especially where conduct is made criminal,[29] has in recent years grown considerably.[30] Thus, implied rights of action have been allowed under the Securities Exchange Act,[31] the National Bank Act,[32] Federal Communications Act,[33] Railway Labor Act,[34] the Rivers and Harbors Appropriation Act,[35] and the Federal Labor Standards Act;[36] and we have noted the cases under the Federal Aviation Act, *supra*.[37] However, no case has been called to my attention in which a civil action based on unreasonable or discriminatory *rates* has been found to be implied under a statute which delegates power to a Federal regulatory agency. As Judge Rubin was careful to note in allowing a civil remedy in a FLSA case:

> "The FLSA is not a regulatory law delegating broad discretionary responsibilities to a specialized administrative agency charged with governing an

industry or a phase of commercial relations. Instead, it bestows a series of rights on a broad class of employees, and arms the Secretary of Labor with extensive power to help the employees enforce those rights." [38]

In conclusion, this Court declines to find an implied Federal right of action under § 404(b) primarily for two reasons. Congressional inaction since 1959 with regard to the Federal Aviation Act has left the authority of *T.I.M.E.* intact, and it is not for this Court to perform the legislative function of overruling it. Secondly, the policy notions of uniformity which underlay *T.I.M.E.* are as much present here as they were before the Supreme Court when it was considering the Motor Carrier Act; it was these policies that dictated the result in *T.I.M.E.*, not the I.C.C. powers of suspension of tariffs which were, after all, noted by Justice Harlan in the way of afterthought.

These considerations would also seem to have disposed of the claim to a common law right of recovery. However, in 1962, the Court decided Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962).[39] The Supreme Court held there that the facts before it—a shipper's claim to recovery of overcharges resulting from a motor carrier's misrouting—

28. *But cf.* Continental Charters, Inc. (Battista), 16 C.A.B. 772 (1953). Chief Judge Friendly's language was quoted with approval by another panel in Tishman & Lipp, Inc. v. Delta Air Lines, Inc., 413 F.2d 1401, 1406 n. 8 (2 Cir. 1969) even though Judge Friendly had written before Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., *infra.*

29. See § 902(a), 49 U.S.C. § 1472(a).

30. When, as late as 1951, Mr. Justice Frankfurter sought authority for implying civil actions to remedy violations of Federal statutes, his citations were mostly labor cases.

31. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

32. Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940).

33. Reitmeister v. Reitmeister, 162 F.2d 691 (2 Cir. 1947).

34. Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944).

35. United States v. Perma Paving Co., 332 F.2d 754 (2 Cir. 1964).

36. Fagot v. Flintkote Co., 305 F.Supp. 407 (E.D.La.1969).

37. *Fitzgerald, Wills,* and *Mortimer, supra*; see also Allied Air Freight, Inc. v. Pan American World Airways, Inc., 393 F.2d 441, 449 (2 Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968), a case which did not involve fares or rates, but boycott as a tort.

38. Fagot v. Flintkote Co., 305 F.Supp. 407, 413 (E.D.La.1969).

39. See also Pensick & Gordon, Inc. v. California Motor Express, 371 U.S. 184, 83 S.Ct. 264, 9 L.Ed.2d 227 (1962).

were not governed by *T.I.M.E.*, which it chose not to overrule. The majority held that a challenge "directed not at the 'reasonableness' of the rates but at the carrier's misrouting practice" did not bring the action within the rule of the *T.I.M.E.* case. The survival of a damage claim was held to be "entirely consistent with the Act" and hence "meets the proviso of the 'saving clause' as well as the teaching of *T.I.M.E. Inc.*" (371 U.S. at 87, 83 S.Ct. at 159). The emphasis seems to have been on the practical considerations that misrouting can never be known in advance while rates can be, and that recovery for misrouting can be granted without upsetting the regulatory scheme. The Court said:

" * * * the survival of a judicial remedy under the saving clause of § 216(j) [49 U.S.C. § 316(j)] cannot be determined on the presence or absence in the Commission of primary jurisdiction to decide the basic question on which relief depends. Survival depends on the effect of the exercise of the remedy upon the statutory scheme of regulation. According to § 216(j), if the remedy is inconsistent with that scheme it does not survive. In *T.I.M.E. Inc.*, we found inconsistencies and hence no judicial remedy survived." *Id.* at 89, 83 S.Ct. at 160.

The case at bar then falls into the interstice between *T.I.M.E.* and *Hewitt-Robins*, so far as the survival of a common law right is concerned. Aviation fares, unlike routes, are known in advance by virtue of a filed tariff, but the CAB does not have authority to reject the tariff (except for deficiencies in formal compliance); the I.C.C. does have such power respecting motor carrier rates, as the *Hewitt-Robins* Court notes in explaining *T.I.M.E.* The more compelling distinction again appears to this Court to be the nature of the complaint and the consequent effect on uniform regulation, rather than the power of the agency; and the two cases can be best reconciled, as they were by the Supreme Court, on the theory that the question was "not one of rates but of routes" (371 U.S. at 87, 83 S.Ct. at 159). How much comfort a District Court may derive from such a theory is open to question. Certainly, *Hewitt-Robins* suggests that the vitality of *T.I.M.E.* does not persist unimpaired. Yet a District Court is not empowered to reject Supreme Court precedent on the ground that it is moribund except in the clearest cases. So, unless the Supreme Court more explicitly overrules *T.I.M.E.*, it is binding precedent in this case. Since "[s]urvival [of a judicial remedy] depends on the effect of the exercise of the remedy upon the statutory scheme of regulation," I conclude that here a surviving right of action would interfere with the statutory scheme of regulation.[40]

The conclusion the Court comes to, then, is the following:

1. Whether a filed rate is "unreasonable" or "unjustly discriminatory" must, in any case, be determined in the first instance by the CAB. There is no distinction between the two, since to determine either claim expert knowledge is required and uniformity is desired.

2. *T.I.M.E.* and *Montana-Dakota Utilities Co., supra*, teach that a refer-

---

40. It should be noted that the Court in *Hewitt-Robins* did not hold that a right of action was implied from the statute itself; its holding was limited solely to whether there was a survival of a common law right under the saving clause. Thus, it had no occasion to pass on the holding of *Fitzgerald, supra*, that a civil right of action was implied by the statute, nor to suggest that the ruling in *T.I.M.E.* that no civil cause of action was implied by the provisions of the Motor Carrier Act was wrong. See *O'Neil*, Public Reg- ulation and Private Rights of Action, 54 Calif.L.Rev. 231, 247 n. 70 (1964). Even if the language in *Hewitt-Robins* relating to the "effect of the exercise of the remedy upon the statutory scheme of regulation" goes beyond the survival of a common law right and offers a touchstone for a statutorily implied claim for relief as well, such claim for past discrimination in rates would still not be implied for the reasons already stated in this opinion.

ence to the agency should not be made if the Court determines that neither the Court nor the agency is empowered to grant reparations.

3. The *T.I.M.E.* ruling, under the Motor Carrier Act, was that the Congress did not intend to imply a civil action for damages resulting from the charging of an unjustly discriminatory filed rate. This Court holds that there is no substantial distinction between the Federal Aviation Act and the then Motor Carrier Act with regard to the *ratio decidendi*— the need for uniform regulation—and *T.I.M.E.* therefore controls.

4. *Hewitt-Robins* does not purport to overrule *T.I.M.E.* on its denial of an implied cause of action arising from the statute.

5. *T.I.M.E.* also held that no common law right of action for damages resulting from unjustly discriminatory filed rates survived the passage of the Motor Carrier Act. Again, this Court holds that *T.I.M.E.* controls the Federal Aviation Act as well.

6. Although *Hewitt-Robins* did hold that certain common law claims could survive under the Motor Carrier Act, the logic of that case does not undermine the applicability of *T.I.M.E.* to common law claims based on the discrimination of rates in filed tariffs.

7. Accordingly, even if diversity of citizenship and a proper common law cause of action, dependent on undue discrimination in filed rates, had been pleaded,[41] I would be constrained to hold it extinguished by the Federal Aviation Act, just as I must hold that no Federal claim for relief is implied by the Act itself.

8. Since no claim for such damages lies in this Court, and since the CAB can grant no such damages, the complaint must be dismissed.

Having reached these conclusions under the requirements of governing authority, I should like to advert to some brief considerations of justice and policy.

The result should not be seen as unjust simply because it is held that the non-youth passengers are without remedy anywhere. Certainly, it does not appear that the defendants were unjustly enriched at the plaintiffs' expense. Moreover, there is grave doubt whether the plaintiffs were ever actually damaged. These plaintiffs paid a rate which they do not contend is in itself unreasonable. Their complaint is not that they paid too much but that others (the youths) paid too little. If the airlines had not filed the youth tariffs at all, the plaintiffs would have paid the same fare they actually did pay. Mr. Justice Cardozo noted this in I. C. C. v. United States, ex rel. Campbell, 289 U.S. 385, 389–390, 53 S.Ct. 607, 609, 77 L.Ed. 1273 (1933):

> "The Commission does not find, and the complainant does not assert, that the rate was unreasonable in the sense that it would be subject to condemnation if a like rate had been charged to others similarly situated. What is unlawful in the action of the carriers inheres in its discriminatory quality, and not in anything else. When discrimination and that alone is the gist of the offense, the difference between one rate and another is not the measure of the damages suffered by the shipper. * * * The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less."

Actual injury must be shown.[42] If the "discrimination" had not been practiced

---

41. See note 47, *infra.*

42. The difference between a shipper discriminated against and a passenger discriminated against is vast. The shipper is put at a competitive disadvantage, since freight charges are a component of cost, which may even result in putting him out of business. The passenger is in competition with no one. Thus, the logic of I.C.C. v. United States, which denied relief to a shipper, is even stronger in this case.

the *youths* simply would have paid more or stayed at home.[43]

This reasoning has support in older authorities, I. C. C. v. Baltimore & O. R. R., 145 U.S. 263, 282, 12 S.Ct. 844, 36 L.Ed. 699 (1892), citing, *inter alia,* Hozier v. Caledonia Ry., 17 Sess.Cas. (2nd Ser.) 302, where a Scotch Court held similarly in its interpretation of the English Traffic Act of 1854.[44] While venerable precedents do not always make for justice in the modern world, the logic of Mr. Justice Cardozo and his predecessors remains impressive.

In the case at bar, for example, the plaintiffs have cited from the June 1970 I.A.T.A. Cost Committee Report. These figures show that the lowest revenue which would cover the costs of economy class service in the North and Mid-Atlantic is 4.86 cents per revenue passenger-mile, whereas the youth fare complained of was less than 3 cents. The plaintiffs argue that, because the youths were carried below cost, the plaintiffs were subsidizing the youths and the airlines. But the opposite conclusion may also be reached. To reduce the fares of the plaintiffs and all others similarly situated to 3 cents by Court judgment would mean that all the past trips in issue would have been operated below cost. That smacks more of a penalty than of a recovery for actual damage sustained.

 Lastly, caution must be exercised by the courts in allowing interference in the field of foreign aviation. The United States does not control the foreign carriers involved. Ocean flights are governed by negotiated agreements and treaties.[45] The President and the Department of State have a strong role to play. To "imply" causes of action against these foreign carriers, who had no warning that such existed, may invite retaliation to the detriment of the national interest.[46]

For the foregoing reasons, defendants' motions to dismiss the complaint are granted.

In light of that decision, plaintiffs' motion for a class action is denied.[47]

So ordered.

---

43. Whether not having the youths aboard might have required raising of the regular rates is not within the competence of this Court to determine, but if that would have been the result the plaintiffs' claims to having been damaged would obviously be even weaker.

44. To a claim of passenger fare discrimination, the Scotch Court said: "It provides for giving undue preference to parties *pari passu* in the matter, but you must bring them into competition in order to give them an interest to complain."

45. W. Bishop, International Law 427–29 (3d ed. 1971) ; 1 Shawcross & Beaumont on Air Law 23–83 (3d ed. 1966).

46. Cf. Note, State Taxation of International Air Transportation, 11 Stan.L.Rev. 518, 519–20, 538 (1959).

47. It might be noted incidentally that even if this Court is in error regarding the survival of a common law claim, it is doubtful whether it would properly support a class action. At common law it was apparently the rule that only he who protested the rate before paying it could sue; he who paid without protest could not. 2 Roser, Railways 1371–72 (1884), cited in *O'Neil, supra* note 40, at 238 n. 27.