Louis DANNA, Robert F. Esler, and all others similarly situated, Plaintiffs-Appellants,

v.

AIR FRANCE et al., Defendants-Appellees.

No. 703, Docket 72–1014.

United States Court of Appeals,
Second Circuit.

Argued May 16, 1972.

Decided July 3, 1972.

Leonard M. Marks, New York City (LoFrisco, Gallagher & Kenny, Gold, Farrell & Marks, Thomas R. Farrell, Martin R. Gold, and Anthony F. Lo-Frisco, New York City, of counsel), for plaintiffs-appellants.

James C. Blair, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants-appellees Pan American World Airways, Inc. and Japan Air Lines Co. Ltd.

Haight, Gardner, Poor & Havens, William J. Junkerman and Carroll E. Dubuc, New York City, of counsel, for defendant-appellee Air France.

Condon & Forsyth, Cyril Hyde Condon and Thomas J. Whalen, New York City, of counsel, for defendants-appellees British Overseas Airways Corp., Air-India, and Qantas Airways, Ltd.

Chadbourne, Parke, Whiteside & Wolff, Harold L. Warner, Jr., New York City, of counsel, for defendant-appellee Trans World Airlines, Inc.

Hill, Betts & Nash, Benjamin E. Haller, New York City, of counsel, for defendant-appellee Olympic Airways, S. A.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge:

Louis Danna and Robert F. Esler appeal from a judgment of dismissal entered by the United States District Court for the Southern District of New York.[1] The appellants purport to represent the class of persons who flew with the defendant airlines during the period of June 1971 to the date of the complaint (August 16, 1971) from New York to and from London or from New York to and from Paris, and who paid more for such flights than other passengers solely because of their age. Appellants claim (1) that the system of fares of the defendant airlines whereby the overseas fare is determined solely by reference to the passenger's age (Youth

Fares) violates section 404(b) of the Federal Aviation Act of 1958 (Act),[2] and (2) that section 404(b) creates an implied right of action for damages for violations thereof.

Judge Gurfein in a thorough opinion granted the defendants' motions to dismiss the complaint. His grounds for so deciding were basically two: first, he concluded that the doctrine of primary jurisdiction precludes initial resort to the federal courts for redress of the alleged violations of section 404(b); second, he concluded that even if plaintiffs obtained the requisite determination from the Civil Aeronautics Board (CAB) that the Youth Fares were violative of section 404(b), the plaintiffs could still not withstand a motion to dismiss because section 404(b) does not create an implied right of action for damages.[3]

We affirm the judgment of dismissal on the basis that by failing to obtain a finding by the CAB that the Youth Fares are violative of section 404(b), the plaintiffs have not stated a claim upon which relief can be granted.[4] Un-

1. Danna v. Air France, 334 F.Supp. 52 (S.D.N.Y.1971).

2. 49 U.S.C. § 1374(b) (1970). The section provides, in relevant part:

No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, . . . in any respect whatsoever or subject any particular person, . . . to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

3. Judge Gurfein also concluded that the Act extinguished any common law cause of action for damages and intimated that the plaintiffs could not show any actual damages. In light of our disposition of the appeal, we need not and therefore do not pass on the soundness of these conclusions.

4. We are explicit in affirming the dismissal for failure to state a claim rather than for lack of subject matter jurisdiction (defendants moved to dismiss on both grounds) for the reasons cogently stated

by Justice Jackson for the Court in *Montana-Dakota*:

As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action. The Judicial Code, in vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions. Petitioner asserted a cause of action under the Power Act. To determine whether that claim is well founded, the District Court must take jurisdiction, whether its ultimate resolution is to be in the affirmative or the negative. If the complaint raises a federal question, the mere claim confers power to decide that it has no merit, as well as to decide that it has.

Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

Plaintiffs claim federal jurisdiction on the basis of 28 U.S.C. § 1337 (1970).

til this requisite finding is pleaded the question of whether section 404(b) creates an implied right of action for damages need not be reached; we therefore express no opinion on the soundness of Judge Gurfein's conclusion on this issue.

### I.

In the Spring of 1971 Sabena Belgian World Airlines, pursuant to a tariff lawfully filed with the CAB, offered discounts on overseas fares to young people.[5] The defendants shortly thereafter requested from the CAB special tariff permission to institute similar discounts without waiting the requisite thirty days.[6] The CAB granted the requests; it later explained its action as follows:

> These short-notice applications were granted because of the unusual circumstances surrounding the Sabena filing. This filing was made pursuant to a government directive, rather than a normal carrier initiated tariff which would have required IATA [International Air Transport Association] traffic conference procedures. Moreover, the tariffs were filed at the onset of the peak eastbound tourist season and, in view of the sharp discount of prevailing fares involved, could be expected to divert heavily from carriers not able to offer the fares. Thus, failure to grant Special Tariff Permission to permit U. S. and other

carriers to offer matching fares as soon as possible would have severely and, in the Board's view, unfairly disadvantaged those carriers. Accordingly, the Special Tariff Permission was granted in order to put all carriers on an equal footing.[7]

The discounts offered to those within the prescribed age limits (generally 12 or 15 to 25) were substantial.[8] The Paris Youth Fare was roughly $200 ($220 during June, July, and August) whereas the cost for persons not within the age group for the same round-trip economy service was approximately $600. The London Youth Fare amounted to $190 plus tax ($210 plus tax during June, July, and August) whereas the same service cost those not qualified $552.

### II.  Primary Jurisdiction

#### A. *Necessity For Resort to the CAB*

■ It is beyond dispute that claims that filed tariffs are either unreasonable in amount or unduly discriminatory in effect are questions that in the first instance must be determined by the agency with which the tariffs are filed.[9] Any attempt to sue in federal court or in state court on such claims without first obtaining an agency determination of unreasonableness or undue discrimination fails to state a cause of action. To sue first in court is to fall into the error of regarding

---

5. The procedures for lawfully filing a tariff are specified in the Act § 403(a), 49 U.S.C. § 1373(a) (1970) and in the relevant regulations, 14 C.F.R. Part 221 (1971). A tariff becomes effective 30 days after filing. Act § 403(c), 49 U.S.C. § 1373(c) (1970).

6. Pursuant to the Act § 403(c), 49 U.S.C. § 1373(c) (1970) and 14 C.F.R. § 221.190 (1971).

7. *Alitalia Airlines*, Docket No. 23516, Order 71–6–110, at 3 (June 22, 1971). In this order the Board denied Alitalia's request for reconsideration of the Board's earlier denial of an application by Alitalia for special tariff permission.

8. Appellants inform us that the American and foreign air carriers have filed com-

pletely new international air fares with the CAB, effective April 1, 1972. Brief for Appellants at 14. The airlines apparently contend that the new system of overseas fares "eliminates the issue of unjust discrimination between youths and persons in other age brackets." *Id.*, quoting from Motion of Pan American World Airways, Inc. To Terminate Investigation, at 3, Docket No. 23780 (Feb. 11, 1972).

9. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 439–443, 27 S.Ct. 350, 51 L.Ed. 553 (1907) (unreasonableness); Robinson v. Baltimore and Ohio R.R. Co., 222 U.S. 506, 511, 32 S.Ct. 114, 56 L.Ed. 288 (1912) (undue discrimination); Lichten v. Eastern Airlines, Inc., 189 F.2d 939, 941 (2d Cir. 1951).

. . . reasonableness as a justiciable legal right rather than a criterion for administrative application in determining a lawful rate. Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission. It is not the disembodied "reasonableness" but that standard when embodied in a rate which the Commission accepts or determines that governs the rights of buyer and seller. A court may think a different level more reasonable. But the prescription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce.[10]

■ Without obtaining a CAB determination that the discrimination between those within and those without the group eligible for Youth Fares is "undue," and the amount of the "undueness," plaintiffs have failed to establish the predicate upon which their claim for damages, if any, must rest.

Appellants concede, as they must, the general applicability of the doctrine of primary jurisdiction to claims of unreasonableness and undue discrimination. They contend, however, that their claim of discrimination raises an issue that has traditionally been considered outside the scope of the doctrine. While courts have referred claims that filed rates are unreasonable or unduly discriminatory, they have not referred claims that carriers have violated their own filed tariffs or established transportation custom. As Justice Lamar said in the Puritan Coal Mining case:

. . . it must be borne in mind that there are two forms of discrimination, —one in the rule and the other in the manner of its enforcement; one in promulgating a discriminatory rule, the other in the unfair enforcement of a reasonable rule. In a suit where the rule of practice itself is attacked as unfair or discriminatory, a question is raised which calls for the exercise of the judgment and discretion of the administrative power which has been vested by Congress in the Commission. It is for that body to say whether such a rule unjustly discriminates against one class of shippers in favor of another. Until that body has declared the practice to be discriminatory and unjust no court has jurisdiction of a suit against an interstate carrier for damages occasioned by its enforcement. . . .

But if the carrier's rule, fair on its face, has been unequally applied and the suit is for damages, occasioned by its violation or discriminatory enforcement, there is no administrative question involved, the courts being called on to decide a mere question of fact as to whether the carrier has violated the rule to plaintiff's damage. Such suits though against an interstate carrier for damages arising in interstate commerce, may be prosecuted either in the state or Federal courts.[11]

---

10. Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951) (Jackson, J.). The reasoning of the Court is as applicable to claims raising the issue of undue discrimination as it is to claims raising the issue of reasonableness. Robinson v. Baltimore and Ohio R.R. Co., 222 U.S. 506, 511, 27 S.Ct. 350, 51 L.Ed. 553 (1912).

11. Pennsylvania R.R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 131–132, 35 S.Ct. 484, 488, 59 L.Ed. 867 (1915) ; Great N. Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 290–291, 42 S.Ct. 477, 66 L.Ed. 943 (1922) (Brandeis, J.) ; Mitchell Coal and Coke Co. v. Pennsylvania R.R. Co., 230 U.S. 247, 257, 266, 33 S.Ct. 916, 57 L.Ed. 1472 (1913) ; CAB v. Modern Air Transport, Inc., 179 F.2d

Plaintiffs do not claim that the defendants' fares for persons not within the Youth Fare group are violative of a filed tariff. They do not claim that the defendants have discriminated against them in the enforcement of a filed tariff or in the implementation of an established airline industry custom. The plaintiffs paid exactly what the tariffs lawfully filed and lawfully on file stipulated that they should pay. They do claim that the tariff applicable to them was unduly discriminatory. We think it plain that this is a question that should be determined in the first instance by the CAB.

Appellants point to the fact that the CAB has no power to award damages for past discriminatory tariffs.[12]

We fail to see the significance of this observation to the issue under focus here. It is no bar to the application of the primary jurisdiction doctrine that (1) the claimed discrimination relates only to tariffs no longer in effect,[13] or (2) the agency to which resort is required has no power to award reparations should it find a violation by the carrier.[14]

Appellants rest their claim to be excepted from the primary jurisdiction doctrine entirely on a line of cases headed by Fitzgerald v. Pan American World Airways, Inc.[15] In *Fitzgerald* this court held that the doctrine is not applicable to a claim by Negroes that they were denied access to seats reserved for them solely because of their color, in violation

622, 624–625 (2d Cir. 1950). *See, e. g.,* Pennsylvania R.R. Co. v. Puritan Coal Mining Co., *supra* (doctrine not applicable where defendant violated its own rule of distribution in furnishing plaintiff with railroad cars); Pennsylvania R.R. Co. v. Sonman Shaft Coal Co., 242 U.S. 120, 37 S.Ct. 46, 61 L.Ed. 188 (1916) (doctrine not applicable where defendant violated established common law duty to furnish plaintiff with reasonable supply of cars). *See generally* L. Jaffe, Judicial Control of Administrative Action 125–32 (1965).

12. *See* Act § 1002, 49 U.S.C. § 1482 (1970).

13. As Justice Brandeis said for the Court in the *Great Northern Railway* case:
    To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases.
    Great N. Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); Mitchell Coal and Coke Co. v. Pennsylvania R.R. Co., 230 U.S. 247, 258–259, 33 S.Ct. 916, 57 L.Ed. 1472 (1913).

14. The Court thus applied a principle [in United States Navigation Co. v. Cunard S.S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932)], now firmly established, that in cases raising issues

of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.
Far East Conference v. United States, 342 U.S. 570, 574–75, 72 S.Ct. 492, 96 L.Ed. 576 (1952) (Frankfurter, J.); Hewitt-Robins Inc. v. Eastern Freight-Ways, Inc., 371 U.S. 84, 88–89, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962); Federal Maritime Bd. v. Isbrandtsen Co., 356 U.S. 481, 497–499 (1958). *See* Jaffe, Primary Jurisdiction Reconsidered. The Anti-Trust Laws, 102 U.Pa.L.Rev. 577, 579–80 (1954).

15. 229 F.2d 499 (2d Cir. 1956). The other cases relied upon are Allied Air Freight, Inc. v. Pan American World Airways, Inc., 393 F.2d 441, 449 (2d Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968) (doctrine no bar to claim that defendant conspired to restrain trade by granting undue prefer-

of section 404(b). But *Fitzgerald* and its progeny are clearly distinguishable from the instant case; they fall into the exception to the doctrine so well articulated by Justice Lamar: where the claimed "undue discrimination" arises from the manner in which tariffs or established transportation custom are applied, the doctrine is not a bar to suit in a court of law. Where the claim is that the tariff *itself* is unduly discriminatory we fail to see how a rule so solidly established in our federal jurisprudence can be denied: primary resort must be to the agency with which the tariff is filed for a determination of whether the tariff is unduly discriminatory and, if so, the amount of the undueness.

### B. *Rationale For the Doctrine*

We need discuss only briefly the rationale for the doctrine of primary jurisdiction and its applicability to this case. First, to permit the court below initially to determine whether the Youth Fares are violative of section 404(b) would invite the very disruption in the orderly review of the lawfulness of tariffs that the doctrine is meant to discourage. The CAB is currently conducting an investigation into the lawfulness of the very fare systems here under attack.[16] Before the federal courts examine these tariffs the CAB must be given the opportunity to do so. Second, the examination of these fare systems requires the exercise of an expertise more heavily concentrated in the Administrative and Executive branches than in the federal judiciary. While we agree with Judge Gurfein that an examination of discrimination *per se* in this case may not pose as difficult an economic analysis as determinations of the reasonableness of tariffs in general,[17] other considerations pose problems in this case not present in many others.

The determination of the legality of the Youth Fares obviously involves considerations of foreign policy. The operation of foreign-owned airlines to points in this country, and of American-owned airlines to points in foreign countries, is permitted by virtue of, and governed by, bilateral agreements between the United States Government and foreign governments.[18] Section 1108(b) of the Act requires the CAB to exercise its powers with respect to foreign-owned civil aircraft in a manner consistent "with any treaty, convention, or agreement which may be in force between the United States and any foreign country or countries."[19] These bilateral agreements characteristically provide that in the event that either party is dissatisfied with a rate proposed by an airline of either government (a "rate proposed" includes rates filed with the CAB), and if the two governments are unable to agree on an appropriate rate, then upon

---

ences in air space to a competitor of the plaintiff), Mortimer v. Delta Air Lines, 302 F.Supp. 276 (N.D.Ill.1969) (claim that defendant barred plaintiffs from oversold flight for which plaintiffs had tickets and confirmed reservations; assumed that doctrine not applicable where CAB lacks power to award damages for past wrongs), and Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal. 1961) (defendant bumped plaintiff from oversold flight even though plaintiff's reservation confirmed prior to passengers not bumped; doctrine held not applicable on the ground that the CAB has no power to award damages for past wrongs).

16. International Student and Youth Fares Applying to U.S. Residents, Docket No. 23780, Order 71-9-3 (Sept. 1, 1971), 36 Fed.Reg. 18024.

17. *See* 334 F.Supp. at 57.

18. *See, e. g.,* Air Transport Agreement with India, Feb. 3, 1956, [1956] 1 U.S.T. 275, T.I.A.S. No. 3504; Air Transport Agreement with Japan, Aug. 11, 1952, [1953] 2 U.S.T. 1948, T.I.A.S. No. 2854; Agreement with Australia Respecting Air Transport Services, Dec. 3, 1946, 61 Stat. 2464, T.I.A.S. No. 1574; Agreement with France Respecting Air Transport Services, Mar. 27, 1946, 61 Stat. 3445, T.I.A.S. No. 1679; Agreement with Greece Respecting Air Transport Services, Mar. 27, 1946, 61 Stat. 2937, T.I. A.S. No. 1626; Air Services Agreement with United Kingdom of Great Britain and Northern Ireland, Feb. 11, 1946, 60 Stat. 1499, T.I.A.S. No. 1507.

19. 49 U.S.C. § 1508(b) (1970).

the request of either government the issue must be submitted to the International Civil Aviation Organization for an advisory report. Each government agrees to use its best efforts to implement the recommendation made in the report.[20]

Since March of 1972 the CAB has had the power to suspend the effectiveness of overseas fares pending an investigation into their lawfulness.[21] At the time the fares here in issue were filed the Board had no such authority. But the new statute provides that any order of the CAB suspending the effectiveness of filed rates first be submitted to the President, who may disapprove of the order for reasons of national defense or foreign policy.[22] Finally, section 1006(a) of the Act provides that there shall be no judicial review of CAB orders that are subject to the approval of the President under section 801.[23] Clearly the courts, if they are to play any role at all in the examination of the legality of overseas fares, are to play a role secondary to that of the CAB and the Executive.

Finally, another factor complicating the review of the lawfulness of the Youth Fares is the factor of competition. As the CAB expressed in its order explaining its grant of special tariff permission to the defendants, once one airline institutes a fare system that places it at a competitive advantage *vis-a-vis* its competitors, the pressures become intense to permit the competitors to follow suit. To what extent such competitive pressures may justify fare discrimination is a question that we do not decide, but we do decide that there is sufficient support in the Act for such a

justification[24] to require that the CAB be the initial forum for the exploration of the issue.

The judgment of dismissal is affirmed.

---

**20.** *See, e. g.*, Agreement with Japan, *supra* note 18, art. 13, para. H; Agreement with Australia, *supra* note 18, Annex § V; Agreement with France, *supra* note 18, Annex § V, para. H; Agreement with United Kingdom, *supra* note 18, Annex, Pt. II, para. *g.*

**21.** Act of Mar. 22, 1972, Pub.L. No. 92–259, § 3(a), 86 Stat. 95, adding § 1002 (j), 49 U.S.C. § 1482(j).

**22.** *Id.* § 2, adding § 801(b), 49 U.S.C. § 1461(b).

**23.** 49 U.S.C. § 1486(a) (1970).

**24.** *See* Act §§ 102(a), 1002(e), (5), 49 U.S.C. §§ 1302(a), 1482(e) (5) (1970); Act of Mar. 22, Pub.L. No. 92–259, § 3(a), 86 Stat. 95, adding § 1002(j) (5) (E), 49 U.S.C. § 1482(j) (5) (E).