**VIKING TRAVEL, INC., on behalf of itself and all others similarly situated, Plaintiffs,**

v.

**AIR FRANCE (Compagnie Nationale Air France) et al., Defendants.**

**No. 76 C 2195.**

United States District Court,
D. New York.

June 2, 1978.

Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., Adler, Barish, Levin & Creskoff, Philadelphia, Pa., Stephen Hochberg, New York City, Fred W. Phelps, Topeka, Kan., for plaintiffs; Harold E. Kohn, Stuart H. Savett, Donald L. Weinberg, Carole A. Broderick, Arnold Levin, Josephine Stamm, Philadelphia, Pa., of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for Trans World Airlines, Inc.

Simpson, Thacher & Bartlett, New York City, for Pan American World Airways, Inc.

Debevoise, Plimpton, Lyons & Gates, New York City, for all Foreign Air Carriers.

## MEMORANDUM AND ORDER

BRAMWELL, District Judge.

The decisions reached herein are in answer to the defendants' motion to dismiss the complaint. The underlying action was commenced by Viking Travel, Inc. on behalf of itself and other similarly situated travel agents against two domestic and seventeen foreign airlines engaged in transatlantic air service. The complaint sets forth two causes of action. The first alleges that the defendants have violated section 403(b) of the Federal Aviation Act,[1] 49 U.S.C. § 1373(b). For its second cause of action, plaintiff claims that defendants have violated sections 1[2] and 2[3] of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.[4] Both causes of action are premised upon the ex-

istence of an allegedly "discriminatory and unlawful rebate system utilized by defendants and certain favored travel agents to suppress competition in the sale for . . . foreign air travel."[5] Relying on Rule 12(b) of the Federal Rules of Civil Procedure, the defendants moved to dismiss the complaint on the grounds that it fails to state a claim upon which relief can be granted, that the plaintiff lacks standing to sue, and, that notwithstanding these deficiencies, the United States Civil Aeronautics Board (hereinafter "C.A.B.") has primary jurisdiction over the subject matter of the instant litigation.

## FACTS ALLEGED IN THE COMPLAINT

Each of the defendants are members of the International Air Transport Association (hereinafter "IATA") who are permitted to operate in the United States pursuant to authorizations issued by the C.A.B. See 49 U.S.C. §§ 1371, 1372. Pursuant to section 403(a) of the Federal Aviation Act, 49 U.S.C. § 1373(a),[6] each defendant air carrier

---

1. Section 403(b) provides in pertinent part:

    (b)(1) No air carrier or foreign air carrier or any ticket agent shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in then currently effective tariffs of such air carrier or foreign air carrier; and no air carrier or foreign air carrier or ticket agent shall, in any manner or by any device, directly or indirectly, or through an agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities, with respect to matters required by the Board to be specified in such tariffs except those specified therein.

2. Section 1 of the Sherman Act provides:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

3. Section 2 of the Sherman Act provides:

    Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

4. The complaint also alleged two separate violations of the Robinson-Patman Act, 15 U.S.C. § 13, and a violation of the September 29, 1975 consent decree entered by this Court against these same defendants in an action brought by the United States, see note 12 infra. These causes of action were subsequently withdrawn by plaintiff. Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss the Complaint at 1 n.1.

5. Complaint ¶ 1.

6. Section 403(a) provides:

    (a) Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air

is required to file with and have approved by the C.A.B. a tariff setting forth the rates, fares and charges to be received for foreign air transportation.[7] Viking, a Kansas corporation, alleges that at all relevant times it was an IATA approved travel agent which was authorized to sell international air transportation and receive commissions for such sales from IATA member air carriers.[8]

As previously noted, the first cause of action charges a violation of section 403(b) of the Federal Aviation Act. Specifically,

the complaint alleges two distinct violations of that section. First, it is claimed that the defendants did knowingly charge, collect or receive a lesser or different compensation for transatlantic service than the rates, fares and charges specified in a carrier's applicable tariff. Secondly, it is alleged that the defendants did knowingly discount, refund or remit portions of the rates, fares or charges specified in the applicable tariffs to co-conspirator travel agents[9] or to the purchasers of transatlantic air transportation.[10] The complaint further alleges that

7. Foreign air transportation is
transportation between points served by it, and between points served by it and points served by any other air carrier or foreign air carrier when through service and through rates shall have been established, and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. Tariffs shall be filed, posted, and published in such form and manner, and shall contain such information, as the Board shall by regulation prescribe; and the Board is empowered to reject any tariff so filed which is not consistent with this section and such regulations. Any tariff so rejected shall be void. The rates, fares, and charges shown in any tariff shall be stated in terms of lawful money of the United States, but such tariffs may also state rates, fares, and charges in terms of currencies other than lawful money of the United States, and may, in the case of foreign air transportation, contain such information as may be required under the laws of any country in or to which an air carrier or foreign air carrier is authorized to operate.

the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between . . .
(c) a place in the United States and any place outside thereof;
whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.
49 U.S.C. § 1301(21).

8. IATA is an international organization of air carriers engaged in international air service. The relationship and dealings between IATA airlines and approved travel agents is governed by resolutions passed by IATA members and approved by C.A.B. *See McManus v. C.A.B.,* 286 F.2d 414, 416 (2d Cir.), *cert. denied,* 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961); 49 U.S.C. § 1382; IATA Resolution 810a; 33 CAB 157, 170 (1961). These resolutions establish criteria and procedures for the selection,

appointment, and retention of ticket agents, and provide that no IATA member airline can appoint or retain a travel agent who has not applied to and been approved by IATA. *McManus, supra* at 416. Viking, therefore, could not sell international air tickets for the defendants and receive commissions for such sales until it was first approved by IATA. Viking obtained such approval in April of 1975. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss The Complaint at 2.

The commission rate to be paid to travel agents by IATA carriers on the sale of international air tickets through April 30, 1975, was set forth in Resolution 810a. As of that date, however, this rate structure was terminated and an open commission structure was established whereby each airline would set its own rate for travel agents according to the law of supply and demand. *See* C.A.B. Order 76-7-56 (July 16, 1976); Defendants' Memorandum in Support of Motion to Dismiss at 4; Amicus Curiae Brief of the International Air Transport Association (IATA) at 8-9.

9. The alleged unnamed co-conspirators are "[v]arious IATA approved travel agents authorized to sell international air tickets who have been favored by the defendants [,who] have participated with the defendants in the offenses [specified in the complaint] and [who] have performed acts in furtherance thereof." Complaint ¶ 26.

10. Count One of the complaint would appear to be defective in so far as it relates solely to rebates and discounts paid to co-conspirator travel agents. Complaint ¶ 35(b). As previously noted, commissions paid to travel agents are not presently subject to C.A.B. regulation. See note 8 *supra.* Therefore, to the extent that the aforementioned remissions to travel agents are merely commissions paid by the air carrier, no violation of § 403(b) would have occurred. However, if the purported commissions to travel agents were either directly or indirectly passed on to users of air transportation by the

the devices used to accomplish the above 403(b) violations included the selling of tickets at special fares to persons ineligible for such special fares, transporting charter passengers on scheduled flights at charter rates and making commission payments to travel agents under circumstances where the airline making the payment intended, knew or had reason to know that the travel agent would use such commission in connection with the aforementioned 403(b) violation.

In support of their motion to dismiss the cause of action, defendants contend that no private right of action exists in favor of travel agents against air carriers for alleged violations of section 403(b) of the Federal Aviation Act. Alternatively, defendants argue that Viking has failed to show any actual injury caused by the alleged illegal activity and hence, has failed to state a claim upon which relief can be granted.

travel agent then a valid claim under § 403(b) has been alleged. *See* Memorandum of the Civil Aeronautics Board as Amicus Curiae at 7.

**11.** See n.9 *supra*.

**12.** It is to be noted that the allegedly unlawful and discriminatory rebate system which forms the basis of both the § 403(b) claim and the Sherman Act claims was the subject of a consent decree entered into by the defendants herein before this Court on September 29, 1975 in an action brought by the United States. The operative section of this decree enjoined and restrained the defendants, their officers, directors, managing agents, employees engaged in sales, marketing and related activities, and ticket agents and their respective successors and assigns from:

(A) in any manner or by any device, directly or indirectly, or through a ticket agent, or otherwise, knowingly charging, demanding, collecting or receiving with respect to the sale of passenger air transportation, a greater or less or different compensation for air transportation than the rates, fares and charges specified in defendants' then currently effective tariffs on file with the Civil Aeronautics Board pursuant to 49 U.S.C. § 1373(a); and
(B) in any manner or by any device, directly or indirectly, or through a ticket agent, or otherwise, knowingly refunding or remitting to any purchaser of passenger air transportation any portion of such rates, fares, and charges.

Plaintiff's second cause of action is also predicated on the claimed illegal rebate system which provides the cornerstone for the first cause of action. Plaintiff charges that prior to December 2, 1972 and continuing through the present, the defendants and their co-conspirators [11] have conspired to unlawfully restrain or monopolize interstate or foreign commerce in the sale of transatlantic foreign air transportation and package tours in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiff contends that the purpose of this conspiracy was to foreclose Viking and the class of similarly situated travel agents from competing with those favored travel agents who are or were receiving or benefiting from the aforesaid rebate system. As a result of this combination or conspiracy, plaintiff contends that sales and profits have been diverted from plaintiff and other members of the class to these favored co-conspirator travel agents.[12]

Such devices as referred to in subdivisions (A) and (B) of this paragraph include without limitation:
(1) selling tickets at special fares to persons not eligible for such fares;
(2) transporting charter passengers on scheduled flights at charter rates; and
(3) making payment to, or for the benefit of, a ticket agent of a commission or compensation for the sale of passenger air transportation, where the air carrier or foreign air carrier making the payment intends, knows, or has reason to know that the ticket agent will use such commission or compensation in connection with a violation of subdivisions (A) or (B) of this paragraph.
Final Judgment ¶ 3, *United States of America v. Air France, et al.,* 75 C 1578 (E.D.N.Y. September 29, 1975) (Bramwell, D. J.). Besides being enjoined from engaging in the above illegal practices, the defendants were ordered to take affirmative action to assure compliance with the decree.
The procedural history which culminated in this consent decree can be briefly summarized. In mid 1972, illegal methods of competition engaged in by various airlines and ticket agents were brought to the attention of the C.A.B. These illegal methods involved various types of unauthorized payments to travel agents and tour operators. The devices employed to effect these illegal rebates in the sale of passenger air transportation included accepting as affinity charter group passengers people who were not bona fide members of the affinity group, and

In urging the dismissal of the second cause of action, defendants argue that the complaint in actuality charges nineteen separate conspiracies between a named defendant and one or more unnamed co-conspirator travel agents. Since these co-conspirators are unidentified, defendants argue that no conspiracy in violation of the Sherman Act has been set forth as a matter of law. Defendants also claim that plaintiff lacks standing to bring a lawsuit under the Sherman Act since plaintiff is not within the "target area" of the allegedly illegal antitrust conspiracy and has not been directly injured by that activity. *See Long Island Lighting Co. v. Standard Oil Co. of California,* 521 F.2d 1269, 1273–74 (2d Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976). Finally, defendants claim that since the complaint did not set forth any compensable injury with the required specificity, plaintiff has failed to state a claim upon which relief can be granted.[13]

making cash payments to travel agents (other than approved sales commissions) to "cleanse" the under-collection of fares from passengers so that the agent would then be in a position to submit checks to the air carrier at the fares specified in the applicable tariff.

By Order 72–8–89 dated August 21, 1972, the C.A.B. initiated an investigation into the "apparently widespread unlawful passenger-fare discounting practices in the North Atlantic Market." 37 Fed.Reg. 17505 (August 29, 1972). In this Order, the C.A.B. stated that it possessed information concerning use by air carriers, tour operators and ticket agents of the unlawful sales methods and devices to improve their competitive positions. Specifically, it stated:

> Some carriers may be permitting special rates or concessions to persons purchasing large blocks of seats for resale to the public. Such other persons are said to be reselling such seats at amounts less than those set forth in the carriers' applicable tariffs or to persons ineligible for the fares provided either with or without the knowledge or consent of the carrier.

*Id.* at 17506. The investigation was to concentrate on certain specified illegal rate-cutting devices including improper use of affinity *group fares and excess payments to favored* tour operators and travel agents. The purpose of the investigation· was to

> (a) Determin[e] the existence and extent of any rate-cutting, discounting, rebating or other unlawful practices . . . and to determine the identities of any air carrier . . . tour operator, ticket agent, or other person engaged in such activities;
>
> (b) Obtai[n] evidence with respect to any such unlawful practices for possible use in an enforcement proceeding before the Board or for possible referral to the appropriate U. S. Attorney for use in civil or criminal actions in the Federal courts; . . ..

The Order ended with the following statement:

> If engaged in or participated in by carriers, *tour operators, ticket agents or other persons,* these activities may constitute violations of one or more sections of the Federal Aviation Act, particularly sections 401(a),

403(b), 404(b), 902(d) and 1002(f) and may constitute unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof within the meaning of section 411. Such activities may require the issuance of an order by the Board under section 1002(c), and/or the pursuit of civil or criminal penalties under section 901(a) and 902(a) and (d) of the Act.

37 Fed.Reg. at 17506.

Beginning in April of 1974, a grand jury investigation into these illegal rebating practices was commenced by the United States Attorney's Office for the Eastern District of New York at the request of the Board. Between January 1975 and August 1975, negotiations were conducted with a view towards civil and criminal resolutions of the situation. These negotiations resulted in an agreement whereby the nineteen defendants herein agreed to a plea of nolo contendere to a criminal information alleging ten misdemeanor counts of rebating. Additionally, the carriers agreed to enter into the aforementioned civil consent decree. The agreements were ultimately effected on September 29, 1975.

Subsequent to the entering of the civil injunction, the United States Attorney successfully brought criminal contempt actions against Iberia Air Lines of Spain, *see* Docket No. 76 CR 295(S), and Sabena Belgian World Air Lines, *see* Docket No. 77 CR 6, for violations of the consent decree. Recently, the United States Attorney has brought four separate actions against certain travel agents for violation of the consent decree. *See* Docket Nos. 78 CR 71 to 78 CR 74 (filed February 10, 1978). These latter actions are being held in abeyance pending resolution of an action brought by an association of travel agents which seeks a declaratory judgment that the consent decree is not binding on travel agents. *See* Docket No. 78 C 701 (filed April 11, 1978).

**13.** Overshadowing all of the defendants' contentions, is their claim that the C.A.B. has primary jurisdiction over this action requiring dismissal of this litigation. The Court, however, need not reach this issue unless it rules nega-

## THE SECTION 403(b) CLAIM

■ The first issue to be resolved is whether a private right of action exists under section 403(b) of the Federal Aviation Act in favor of Viking and the class of similarly situated travel agents which it seeks to represent. Should this question be answered in the negative, the remaining contention of the defendants as to the first cause of action need not be addressed.

In urging this Court to imply a private remedy under section 403(b), plaintiff relies on a series of cases in which private rights of action were implied under sections 403(b) and 404(b) of the Federal Aviation Act.[14] However, of all these cases only *United States v. Associated Air Transport, Inc.,* 275 F.2d 827 (5th Cir. 1960), involved a suit which raised section 403(b) issues. Moreover, the only decision brought to the Court's attention which implied a private right of action in favor of a travel agent is *William Becker Travel Bureau v. Sabena Belgian World Airways, Inc.,* 13 Avi. 17,770 (S.D.N.Y.1975). This case, however, involved a suit under section 404(b) rather than section 403(b). *See also Mason v. Belieu,* 177 U.S.App.D.C. 68, 72, 543 F.2d 215, 219 (dicta), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976). Most significantly, each of the decisions cited by plaintiff was rendered prior to the recent Supreme Court decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which sets forth four factors to be considered in determining whether a private

right of action is implicit in a statute which does not specifically create one:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" . . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

In urging that no private right of action exists under section 403(b), defendants rely on the decisions of *Rauch v. United Instruments, Inc.,* 548 F.2d 452 (3d Cir. 1976); *Wolf v. Trans World Airlines, Inc.,* 544 F.2d 134 (3d Cir. 1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977); *Mason v. Belieu,* 177 U.S.App.D.C. 68, 543 F.2d 215, *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *Polansky v. Trans World Airlines, Inc.,* 523 F.2d 332 (3d Cir. 1975), all of which were decided after *Cort.* After applying the analytical approach suggested in *Cort,* the courts in each case held that no implied right of action exists under various sections of the Federal Aviation Act.[15]

---

tively on any or all of the defendants' contentions.

14. *See Nader v. Allegheny Airlines, Inc.,* 167 U.S.App.D.C. 350, 512 F.2d 527 (1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Archibald v. Pan American World Airways, Inc.,* 460 F.2d 14 (9th Cir. 1972); *Allied Air Freight v. Pan American World Airways, Inc.,* 393 F.2d 441 (2d Cir.), *cert. denied,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *United States v. Associated Air Transport, Inc.,* 275 F.2d 827 (5th Cir. 1960); *Fitzgerald v. Pan American World Airways, Inc.,* 229 F.2d 499 (2d Cir. 1956); *William Becker Travel Bureau v. Sabena Belgian World Airways, Inc.,* 13 Avi. 17,770 (S.D.N.Y.1975); *Gallagher v. Alitalia-Linee Aeree Italiane,* 361

F.Supp. 1097 (S.D.N.Y.1973). *See also Mortimer v. Delta Air Lines, Inc.,* 302 F.Supp. 276 (N.D.Ill.1969); *United States v. City of Montgomery,* 201 F.Supp. 590 (D.Ala.1962); *Wills v. Trans World Airlines, Inc.,* 200 F.Supp. 360 (S.D.Cal.1961).

15. In *Polansky,* the Court refused to recognize a private remedy under sections 404(b) and 411 of the Act, 41 U.S.C. §§ 1374(b), 1381, in favor of passengers claiming that first class accommodations in a tour sponsored by a regulated air carrier were inferior to tourist class services. Similarly, in *Mason* the Court followed the reasoning of *Polansky* in holding that a private right of action does not exist under section 404(b) for non-passengers claiming that they were treated discourteously at airport in-

As to the threshold issue for determination here, however, none of the decisions cited by either the plaintiff or the defendants disposes of this case since none mandate either the implication or denial of a private remedy to the plaintiff. In ruling on this issue, the decisions cited by plaintiff must be re-examined in light of the principles enunciated in *Cort. See Theobarous v. Bache & Co., Inc.*, CCH Fed.Sec.L.Rept. ¶ 96,281 (D.Conn.1977); *Schy v. Federal Deposit Insurance Corp.*, CCH Fed.Sec.L.Rept. ¶ 96,242 (E.D.N.Y.1977).[16] In employing the *Cort* framework, each of the decisions cited by the defendants indicates that a court must carefully examine the facts of each case and the nature of the harm allegedly suffered by the plaintiff in deciding whether a private right of action exists. *See Rauch, supra* at 456, 457–59; *Wolf, supra* at 137; *Mason, supra* at 219–21; *Polansky, supra* at 333, 335.

Turning first to an examination of the relevant statute, on its face, section 403(b) prohibits an air carrier and ticket agent[17] from charging, demanding or receiving fares different than that specified in the applicable tariff and from refunding or remitting any of the fare specified in the tariff or extending any privilege not specified in the tariff to any person. Although it may initially appear that plaintiff may have a right of action under this statute, it is well established that a private remedy will not arise to redress every violation of a statutorily imposed duty. *See Cort, supra, Rauch, supra* at 456. Instead, as the Second Circuit recently stated, the settled rule is

> that before a private right of action may be inferred the would-be plaintiff must show that he is within the class the statute is intended to protect, and that it is not sufficient merely to show that the defendant is within the class the statute is designed to regulate.

*Lank v. New York Stock Exchange*, 548 F.2d 61, 65 (2d Cir. 1977). *See Redington v. Touche Ross Co.*, 592 F.2d 617, at 624 (2d Cir. 1978). This rule is merely a reaffirmation of the first *Cort* factor, that is, that plaintiff must be " 'one of the class for whose *especial* benefit the statute was enacted.' " 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original).

The Federal Aviation Act provides a comprehensive scheme of federal legislation, one of its purposes being to promote

> adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue

---

formation counters. In *Wolf*, the Court refused to imply a private remedy under sections 403(b) and 411 for persons claiming that tour hotel accommodations were so inferior as to be unusable thereby allowing the carrier to obtain a higher price for their services than those specified in the applicable tariff. Finally, in *Rauch*, the Court held that a private right of action did not exist under section 610(a)(7) of the Act, 49 U.S.C. § 1430(a)(7), in favor of aircraft owners who were required to repair and modify defective instruments pursuant to a directive issued by the Federal Aviation Administrator against the manufacturer and distributor of that equipment. *See also Bratton v. Shiffrin*, 440 F.Supp. 1257 (N.D.Ill.1977); *Vandry v. Luftansa German Airlines*, 76 C 2809 (E.D.Pa.1977). *But see Nader v. Allegheny Airlines, Inc.*, 445 F.Supp. 168 (D.D.C.1978); *Roman v. Delta Air Lines, Inc.*, 441 F.Supp. 1160 (N.D.Ill.1977); *Burke v. Eastern Airlines, Inc.*, 14 Avi. 17,776 (N.D.Ga.1977) (cases holding that private right of action does exist under § 404(b) for passengers denied boarding due to carrier's overbooking).

16. Both *Theobarous* and *Schy* held that the Supreme Court's decision in *Cort* effectively overruled the Second Circuit's rule that a private cause of action is to be implied for violations of the margin requirements of the Securities Exchange Act, 15 U.S.C. § 78g. *See Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971).

17. A ticket agent is defined as

> any person, not an air carrier or foreign air carrier and not a bona fide employee of an air carrier or foreign air carrier, who, as principal or agent, sells or offers for sale any air transportation, or negotiates for, or holds himself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts or arranges for, such transportation.

49 U.S.C. § 1301(37). A travel agent such as Viking clearly is a "ticket agent" within the terms of the statute.

preferences or advantages, or unfair or destructive competitive practices.

49 U.S.C. § 1302(c). The Congressional design underlying the Act is further expounded in 49 U.S.C. § 1304 which states that

[T]here is recognized and declared to exist *in behalf of any citizen* of the United States a *public right of freedom of transit* through the navigable airspace of the United States.

(emphasis supplied). Thus, from the very introductory sections of the Act, it is evident that Congress intended to protect and promote the interests of all persons using the facilities of air carriers.[18] As the Third Circuit stated in *Polansky, supra,* the "statute aims to protect the [public] right of access to air facilities." 523 F.2d at 335. *See Lichten v. Eastern Airlines, Inc.,* 189 F.2d 939, 941 (2d Cir. 1951); *Wills v. Trans World Airlines, Inc.,* 200 F.Supp. 360, 363 (S.D.Cal.1961). Moreover, in *Transcontinental Bus System, Inc. v. C. A. B.,* 383 F.2d 466 (5th Cir. 1967), *cert. denied,* 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968), the Court specifically stated that

[s]ections 403(b) and 404(b) provided in general terms, that *airline traffic, both passenger and cargo traffic,* is to be treated equally by the air carriers. *The sections are designed to insure that rates and services are offered on an equal basis to all who seek to use air carriers. They were intended to protect the traveling public* and were designed to effectuate the "rule of equality" in the air transportation industry.

*Id.* at 475 (emphasis supplied). *See Northwest Airlines, Inc. v. United States,* 444 F.2d 1097, 1100, 195 Ct.Cl. 356 (1971).

Thus, within the terms of the first *Cort* test, it is apparent that the act in general and section 403(b) in particular were designed to protect the user of air facilities, whether he be a passenger, cargo shipper or otherwise. Travel agents, however, are not users of air transportation, but are provid-

ers of that service since they are merely "in business of booking and selling to the public transportation by steamship, railroad, airplane, motorcoach or other carrier." *ATC Agency Resolution Investigation,* 29 C.A.B. 258, 285 (1959). Consequently, Viking is not a member "'of the class for whose *especial* benefit the statute was enacted.'" *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original).

Furthermore, in 1974 section 403(b) was amended to specifically bring travel agents within the full regulatory prohibition of that section. *See* 1974 U.S.Code Cong. & Admin.News, pp. 7461, 7466. Similarly, under section 411 of the Act, 49 U.S.C. § 1381, the C.A.B. may supervise the activities of ticket agents. Specifically, if the C.A.B. finds that a ticket agent has engaged in unfair or deceptive practices, under section 411, the agency has the power to issue a cease and desist order. Since travel agents are specifically regulated by the statute, the reasoning of the Supreme Court in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), becomes directly relevant to the instant issue.

As previously indicated, examination of the statute and its genesis shows that Chris-Craft [, a defeated tender offeror,] is not an intended beneficiary of the Williams Act, and is surely not one "for whose *especial* benefit the statute was enacted." To the contrary, Chris-Craft is a member of the class whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class, shareholder-offerees. *As a party whose previously unregulated conduct was purposefully brought under federal control by statute, Chris-Craft can scarcely lay claim to the status of "beneficiary" whom Congress considered in need of protection.*

*Id.* at 37, 97 S.Ct. at 947 (emphasis supplied). Like the situation in *Chris-Craft,* a travel agent is a member of the class whose activities are regulated by the Federal Avi-

---

**18.** Other important purposes of the Act include the fostering of safe air travel, the development of an economically sound and efficient air transportation industry, a system responsive to civil and military needs and the securing of the natural defense as it relates to aviation. *Rauch, supra* at 457 & n.9.

ation Act for the benefit of a distinct class of persons, the users of air carrier services. Thus, the reasoning of Chris-Craft, in light of the 1974 amendment to section 403(b) indicates a legislative design to deny protection to travel agents through the grant of a private right of action against regulated air carriers who have allegedly violated section 403(b).[19]

The second factor in the *Cort* analysis is whether there is any indication of legislative intent to create or deny a private right of action. While the legislative history is bereft of any guidance, *see Wolf, supra* at 138 n.3; *Polansky, supra* at 336, the Act provides for Board enforcement of all statutory provisions and for private enforcement of violations of section 401(a), 49 U.S.C. § 1371(a), only. *See* section 1007, 49 U.S.C. § 1487. In view of the clear enforcement mechanism established by Congress in the Act, the reasoning of the Supreme Court in *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) ("Amtrak"), is enlightening.

> [W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. . . .
> This principle of statutory construction reflects an ancient maxim—*expressio unius est exclusio alterius.* Since the [Rail Passenger Service] Act [,Amtrak Act,] creates a public cause of action for enforcement of its provisions *and a private cause of action only under very limited circumstances,* this maxim would clearly compel the conclusion that the remedies created in § 307(a) are the exclusive means to enforce the duties and obligations imposed by the Act.

*Id.* at 458, 94 S.Ct. at 693 (emphasis supplied in part). Thus, it would appear that

when Congress provides an elaborate system for agency enforcement and only limited rights of private enforcement, the implication of a more extensive system of private judicial enforcement in favor of travel agents would not seem appropriate. *See Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) ("SIPC"); *Amtrak, supra.*

Turning to the third factor to be examined under *Cort,* as has been noted, the purpose of the Act and section 403(b) is to protect users of air transportation. Permitting a travel agent to bring suit against an air carrier because other travel agents have allegedly obtained more favorable treatment, will not necessarily insure that the user's access to air facilities will be improved or that differentiation between such users will be eliminated. Moreover, an argument that the implication of a private right of action under the facts of this case would act as a deterrent against future violations and would serve to more effectively enforce the provisions of the Act is similarly insufficient to bring plaintiff within the ambit of the third *Cort* test. *See Cort, supra, reversing, Ash v. Cort,* 496 F.2d 416, 423 (3d Cir. 1974). *Cf. SIPC, supra; Amtrak, supra; Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964) (cases denying a private enforcement remedy when statutory scheme provided for extensive agency enforcement). Therefore, since Viking's claim fails to satisfy the first, second and third prongs of the *Cort* test,[20] the defendants' motion to dismiss the first cause of action is granted.

## SHERMAN ACT CLAIMS

■ As previously noted, plaintiff's second cause of action charges a violation of

---

**19.** In *Wolf v. Trans World Airlines, Inc.,* 544 F.2d 134, 137 (3d Cir. 1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977), the Court held that passengers were "not the special beneficiaries of § 403(b)." Rather, that section was "designed to empower the C.A.B. to control the supposedly pernicious competitive activities that were the target of the Federal Aviation Act." *Id.* While the Court has not

adopted this interpretation of section 403(b), it is clear that under the *Wolf* analysis, Viking's position must also fail.

**20.** In view of the Court's conclusion as to the application of the first, second and third factors, the Court finds it unnecessary to consider the fourth factor laid down in *Cort v. Ash. See Rauch, supra* at 460.

sections 1 and 2 of the Sherman Act. It is alleged that the defendant airlines and various co-conspirator travel agents have combined and conspired to unlawfully restrain or monopolize interstate or foreign commerce in the sale of transatlantic scheduled foreign air transportation and package tours through the aforementioned discriminatory and unlawful rebate system utilized by the defendants and the favored co-conspirator travel agents. This combination and conspiracy has allegedly consisted of a continuing agreement among the defendants and the co-conspirator travel agents to eliminate competition by plaintiff and the class it seeks to represent. Defendants allege that the complaint must be dismissed for failure to state a claim upon which relief can be granted for a variety of reasons. However, in such a motion, the allegations of the complaint are assumed to be true, see, e. g., Schulman v. Burlington Industries, Inc., 255 F.Supp. 847, 849 (S.D.N.Y.1966), and the complaint must be found sufficient unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see Brager & Co., Inc. v. Leumi Securities Corp., 429 F.Supp. 1341, 1344 (S.D.N.Y.1977); Hunt v. Mobil Oil Corp., 410 F.Supp. 10, 14 (S.D.N.Y.1975), aff'd, 550 F.2d 68 (2d Cir. 1977). While defendants' arguments in support of its motion to dismiss may ultimately prevail, at this stage of the litigation construing the complaint in the light most favorable to the plaintiff, and for the reasons to follow, it is found that the complaint is sufficient.

Defendants argue that the complaint merely charges nineteen separate conspiracies between a defendant airline and one or more travel agents. A fair reading of the complaint, however, indicates that a conspiracy is alleged amongst and between the named defendants and certain travel agents. For example, paragraph 38 of the complaint charges that the "defendants and co-conspirators have engaged in a combination or conspiracy to unlawfully restrain and monopolize . . . commence."

Similarly, paragraph 39 alleges the existence of an agreement "among the defendants and co-conspirators." Finally, paragraph 32(b) indicates that "the defendants and their co-conspirators engaged in a combination, conspiracy and concert of action to unreasonably restrain or monopolize interstate or foreign commerce . . .."

Although defendants urge that an agreement among the defendants or between the defendants and unnamed travel agents makes no economic sense and is "ludicrous" given the composition of the airline industry, such arguments must fail at this preliminary stage. See, e. g., Brager & Co. v. Leumi Securities Corp., supra. Equally premature is defendants' claim that the alleged conspiracy charges no more than vigorous competition among the airlines. Since defendants would be legally capable of conspiring together and with the co-conspirator travel agents, cf. E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manuel Committee, 467 F.2d 178, 187–88 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1923); Nagler v. Admiral Corp., 248 F.2d 1319 (2d Cir. 1957); Giant Paper & Film Corp. v. Albemarle Paper Co., 430 F.Supp. 981, 986 (S.D.N.Y.1977); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321, 1325 (E.D.N.Y.1970), aff'd, 451 F.2d 593 (2d Cir. 1971) (per curiam), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972), the complaint adequately alleges both the conspiracy, a means, and an object or result which, if proved, could amount to an unreasonable restraint of trade and a conspiracy to monopolize. It remains to be seen whether the alleged combination or conspiracy actually existed, whether it was reached for the purpose of restraining trade and whether the object of the alleged conspiracy constituted an unreasonable restraint of trade. See United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Syracuse Broadcasting Corp. v. Newhouse, 319 F.2d 683, 688 n.3 (2d Cir. 1963); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962); Beckman v. Walter Kidde & Co., supra at 1324. Cf. Peelers Co. v.

*Wendt,* 260 F.Supp. 193, 198 (W.D.Wash. 1966). Moreover, the above factors when combined with a specific intent to monopolize, *see United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir. 1961); *Giant Paper & Film Corp. v. Albemarle Paper Co., supra* at 987, are sufficient at this point to allege a conspiracy to monopolize. Concerted action among the defendants and the co-conspirator travel agents to drive plaintiff and its class out of business could amount to an intent to monopolize. *See Bowen v. New York News, Inc.,* 522 F.2d 1242, 1258 (2d Cir. 1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *United States v. Consolidated Laundries Corp., supra* at 572–73; *Brager & Co. v. Leumi Securities Corp., supra* at 1346. *Cf. Schulman v. Burlington Industries Inc., supra* at 852. Therefore, under the allegations of the complaint, plaintiff may be able to prove a set of facts in support of its claims, entitling it to relief under sections 1 and 2 of the Sherman Act.

■ In view of the above, the remaining claimed legal deficiencies of the second cause of action are also insufficient to warrant dismissal. With respect to the claim that the plaintiff lacks standing to assert the antitrust claim, the Second Circuit rule is that standing to sue under the antitrust laws requires a plaintiff to fall within the "target area" of the alleged antitrust conspiracy. *See Long Island Lighting Co. v. Standard Oil Co. of California,* 521 F.2d 1269 (2d Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Nassau County Assn. of Ins. Agents, Inc. v. Aetna Life & Cas. Co.,* 497 F.2d 1151 (2d Cir.), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *GAF Corp. v. Circle Floor Co., Inc.,* 463 F.2d 752 (2d Cir. 1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). In *Calderone,* the court defined the "target area" concept as follows:

In simple terms, a "target" is a person or business against which competitive aim is taken. The line is clearly drawn by requiring that to have standing one must be an object of the antitrust conspiracy. 454 F.2d at 1296 n.2. Under this reasoning and under the previous analysis of the complaint, plaintiff is within the target area of the alleged conspiracy. Plaintiff both does business with certain alleged conspirators and competes with the alleged unnamed co-conspirator travel agents. *See Nassau County Assn. of Ins. Agents, Inc. v. Aetna Life & Cas. Co., supra* at 1153. The conspiracy charged alleges an agreement to injure plaintiff's business by specifically being designed to eliminate plaintiff and its class from competition in the relevant market. Plaintiff is the object of the alleged conspiracy since the anti-competitive effects of the antitrust violations alleged in the complaint are directly felt by plaintiff and the class it seeks to represent. In addition, the complaint charges that plaintiff has been harmed while its competitors, served by the same defendant airlines, are being favored in violation of the antitrust laws. *See Harlem River Consumers Cooperative v. Assoc. Grocers of Harlem, Inc.,* 371 F.Supp. 701, 711 (S.D.N.Y.), *aff'd mem.,* 493 F.2d 1352 (2d Cir. 1974). Moreover, the complaint sets forth "antitrust injury" as that term was defined in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). While it might ultimately be found that plaintiff is not within the target area of any alleged antitrust conspiracy, it must again be emphasized that the Court is now dealing solely with a motion addressed to a pleading, and, as already noted, such interpretations must be rejected at this stage of the litigation.

■ Finally, as to the defendants' claim that the complaint is defective for failure to particularize damages, for the reasons heretofore expressed, the Court finds that the plaintiff has sufficiently particularized damages to withstand the defendants' motion to dismiss on this ground. *Cf. Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Nagler v. Admiral Corp., supra* at 1324–26. Needless to say,

the defendants are free to renew this motion at a later time if the development of this litigation warrants it.

### PRIMARY JURISDICTION

Since the Court has concluded that the Sherman Act cause of action is sufficient to withstand defendants' motion to dismiss at this time, the defendants' primary jurisdiction contention must be considered. The primary jurisdiction doctrine "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific R.R.*, 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). No exact formula exists for applying the doctrine; each case must be considered on its own merits.

> In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.

*Id.* at 64, 77 S.Ct. at 165.

In urging that this matter properly belongs before the C.A.B., defendants point out that the airline industry, particularly the relationship between air carriers and travel agents, is heavily regulated by the C.A.B. Further, the defendants argue that the issues underlying the complaint require the expertise of the C.A.B. as that agency is especially familiar with the customs and practices of the airline industry and the unique marketplace involved in this case. *See id.* at 64–65, 77 S.Ct. 161. Particularly relevant to defendants' argument is that there exists an ongoing C.A.B. investigation into the subject of commissions and other payments made by air carriers to travel agents. *See* C.A.B. Order 76–7–56 (July 16, 1976). Thus, defendants conclude that to assure uniformity and consistency in the regulation of the airline industry, *see Far East Conference v. United States*, 342 U.S.

570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952), the Court must "refrain from taking action which might interfere with [the Boards'] exercise of its lawful powers," *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 221, 86 S.Ct. 781, 786, 15 L.Ed.2d 709, 851 (1966). Furthermore, the defendants urge that C.A.B. consideration of the conduct underlying the complaint would be of a "material aid" to the Court in resolving the antitrust claims. *See Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

It is beyond dispute that the Federal Aviation Act gives the C.A.B. authority to regulate certain aspects of the airline industry. *See Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). However, it is equally uncontroverted that the Act does not completely displace the antitrust laws. *Hughes Tools, supra*, 409 U.S. at 387, 389, 93 S.Ct. 647; *Pan American World Airways, supra*, 371 U.S. at 305, 83 S.Ct. 476; *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203, 207 (9th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1924). While in certain instances, Board action can relieve parties to an agreement from antitrust liability, *see* sections 408, 409, 412, 414 of the Act, 49 U.S.C. §§ 1378, 1379, 1382, 1384, the alleged agreement herein does not fall within any of these statutory categories. Particularly relevant here is section 412 of the Act, 49 U.S.C. § 1382, under which the C.A.B. can approve and thereby immunize contracts and agreements [21] to which air carriers are parties by virtue of section 414, 49 U.S.C. § 1384. Section 412(b), however, specifically provides that the Board must "disapprove any . . . contract or agreement" which is "adverse to the public inter-

---

[21]. It is clear that under § 412 all contracts or agreements affecting air transportation including oral and secretive ones must be filed with the Board. The instant agreement thus comes within the Board's § 412 jurisdiction. *See Allied Air Freight, Inc. v. Pan American World*
*Airways, Inc.*, 393 F.2d 441, 445 (2d Cir.), *cert. denied*, 393 U.S. 646, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *Apgar Travel Agency v. International Air Transport Assn.*, 107 F.Supp. 706, 710 (S.D.N.Y.1952).

est, *or in violation of this chapter."* 49 U.S.C. § 1382(b) (emphasis supplied).

With this in mind, at the heart of plaintiff's complaint is the tariff system now in effect and the allegedly unlawful and discriminatory rebate system utilized by defendants and certain favored travel agents in violation of those properly filed tariffs. Rebating in violation of properly filed tariffs is specifically prohibited under section 403(b) of the Act, 49 U.S.C. § 1373(b). The conduct underlying the complaint is thus clearly in violation of the Act and in accordance with the directives of section 412(b) of the Act, it could not be subject to Board approval. Thus, defendants' reliance on *Hughes Tool* is somewhat misplaced. There, the conduct forming the basis of the alleged antitrust activity had all been subject to express orders of approval which had been entered by the Board pursuant to its statutory authorization. Therefore, all conduct which was no more than the kind of conduct the C.A.B. had approved was immune from the antitrust laws.

> [W]here as here, the C.A.B. authorizes control of an air carrier to be acquired by another person or corporation, and where it specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the C.A.B., not in the hands of those who can invoke the sanctions of the antitrust laws. As noted, the parent company which controls an air carrier is subject to pervasive control by the C.A.B. The control which C.A.B. is authorized to grant or deny under § 408 involves an appraisal of the impact on that control in terms of monopoly and competition; and the ongoing supervision entrusted to the C.A.B. by § 415 is broad enough to put all transactions between parent and subsidiary—as originally conceived or subse-

quently exercised—under C.A.B. supervision.

*Hughes Tool, supra,* 409 U.S. at 387–88, 93 S.Ct. at 661.

■ Since the conduct forming the basis of plaintiff's complaint is not lawful under the Federal Aviation Act or even of "debatable legality" under the Act, *see Carnation Co., supra,* 383 U.S. at 220–22, 86 S.Ct. 781; *Far East Conference, supra; United States Navigation Co. v. Cunard Steamship Co.,* 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932),[22] and by statutory mandate is not subject to the Board's approval, referral of the instant controversy to the C.A.B. is not incumbent upon this Court. *See Breen Air Freight, Ltd. v. Air Cargo, Inc.,* 470 F.2d 767 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973); *Allied Air Freight, Inc. v. Pan American World Airways, Inc.,* 393 F.2d 441 (2d Cir.), *cert. denied,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *Mark Aero, Inc. v. Trans World Airlines,* 411 F.Supp. 610, 615 (W.D.Mo.1976). In *Breen,* the court interpreted its earlier decision in *Allied Air Freight* and the Supreme Court's decision in *Carnation* as

> not requir[ing] a district court to defer to the Board except in those cases where the activities complained of are "lawful" or "arguably lawful" under the Federal Aviation Act of 1958. Also, when the only relief a plaintiff seeks in the district court is an award of damages, the district court need not defer to the Board irrespective of whether the activities are continuing activities or completed activities.

*Breen, supra* at 773; *see id.* at 773 n.5.

Moreover, the Board's authority under section 411 of the Act, 49 U.S.C. § 1381, also does not mandate referral of the instant controversy to the C.A.B. This section authorizes the Board, in the public interest and "upon its own initiative or upon com-

---

**22.** In *Carnation* the Supreme Court interpreted its earlier decisions in *Cunard* and *Far East* as authorizing an antitrust action for damages if the conduct forming the basis of the antitrust complaint is not "arguably lawful" under the regulatory statute at issue. Since the com-

plained of conduct in *Carnation* was "arguably lawful", the Court held that the judicial proceeding should be stayed, pending consideration by the agency of the legality of the conduct under the regulatory statute.

plaint by any air carrier, foreign air carrier, or ticket agent . . . [to] investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof." After notice and hearing, a cease and desist order may be issued if such practices are found to exist. Thus, section 411 leaves to the C.A.B. all questions of injunctive relief, *Pan American World Airways v. United States*, 371 U.S. 296, 310, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), but gives the Board no power to award damages to parties injured by the illegal practices, *id.* at 311, 83 S.Ct. 476. Here, the plaintiff is now only left with a request for damage relief. Additionally, to the extent that section 411 may completely divest a court of jurisdiction, *see id.*, such a situation does not exist here.[23] Thus, since the Board only has the power to enjoin the complained of activities which form the basis of plaintiff's complaint, the Court is in agreement with the conclusion reached by the Ninth Circuit in *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974).

> We conclude, therefore, that the grant of authority to the Board under section 411 does not withdraw from the antitrust litigants the right to proceed for damages alleged to have occurred by reason of antitrust violations of the kind with which the Board has authority to deal only by issuing cease and desist orders.

*Id.* at 208. Thus, while this Court would defer from taking any action which might interfere or conflict with the present or future regulation by the C.A.B. of the air carrier—ticket agent relationship, such a problem is not suggested by the facts herein. Further, this concern would certainly not foreclose the court from awarding treble damages for any past violations of the

Sherman Act should the necessary elements of that offense be proven. *See id.* at 210.

However, from the mere fact that a court has authority to award the damages which an agency lacks, it does not necessarily follow that reference to the C.A.B. is inappropriate. *See Far East, supra*, 342 U.S. at 571–75, 72 S.Ct. 492, 494. In certain instances, it may be advisable to permit the C.A.B. to exercise its appropriate jurisdiction where that procedure would secure "[u]niformity and consistency in the regulation of business entrusted to a particular agency" or where

> the limited functions of review by the judiciary [would be] more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Id. See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 304–06, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *Pan American World Airways, supra*, 371 U.S. at 313 n.19, 83 S.Ct. 476; *Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc.*, 371 U.S. 84, 88–89, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962); *Federal Maritime Board v. Isbrandtsen*, 356 U.S. 481, 497–99, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958); *Western Pacific R.R., supra*, 352 U.S. at 64–66, 77 S.Ct. 161; *Far East, supra*, 342 U.S. at 574–75, 72 S.Ct. 492. Such a case, however, does not exist here. The C.A.B. is given the power to enforce the Act and its regulations by either of two means. Under section 1002 of the Act, 49 U.S.C. § 1482, the Board can institute, on its own, investigations of possible violations and then issue appropriate cease and desist orders to compel compliance. These orders

---

**23.** In *Pan American World Airways*, the Supreme Court held that the Board's jurisdiction under section 411 of the Act, 49 U.S.C. § 1381, to investigate and enjoin unfair practices alleged to have arisen from orders lawfully entered by the Board under sections 408 and 409, 49 U.S.C. §§ 1378, 1379, gave the Board sole jurisdiction to stop such conduct. *Compare Hughes Tool, supra.* In contrast, the C.A.B. has not issued any orders authorizing the defendants' conduct herein but instead has taken action to restrain such conduct. *See note 12 supra* and discussion *infra*.

can then be enforced in the district courts by suits brought under section 1007, 49 U.S.C. § 1487. Alternatively under section 1007, the Board can institute a suit in the district for enforcement purposes. *See C.A.B. v. Aeromatic Travel Corp.*, 489 F.2d 251, 253 (2d Cir. 1973). Thus, in *C.A.B. v. Modern Air Transport, Inc.*, 179 F.2d 622 (2d Cir. 1950), the Court held that the Board could sue to enjoin an air carrier from engaging in air transportation without proper authorization even though it had not issued a cease and desist order.

The relevance of the above statutory framework is that the Board did utilize the latter procedure when it sought and obtained the injunction against the instant defendants. *See* note 12 *supra*. While this injunction was a consent decree without trial or adjudication or finding on any issue of fact or law, while it did not constitute an admission by any of the defendants as to the practices covered in the injunction, it does indicate that the Board has already taken action with respect to the allegedly unlawful and discriminatory rebate system which forms the basis of plaintiff's antitrust claim. Further affirmative action by the Board is indicated by its pre-injunction investigations and its post-injunction enforcement actions. *Id.* When the C.A.B. has exercised its jurisdiction under the Act and has considered and acted upon the specific regulatory issues underlying the antitrust action, the doctrine of primary jurisdiction need not be invoked. *See Klicker v. Northwest Airlines, Inc.*, 563 F.2d 1310, 1312 (9th Cir. 1977); *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974). *Cf. United States v. Philadelphia National Bank*, 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Western Pacific R.R., supra*, 352 U.S. at 69, 77 S.Ct. 161.

In view of the fact that action has already been taken by the C.A.B., it is difficult to understand what should be referred to the Board before the antitrust issues become ripe for judicial determination and defendants have failed to shed any light on this question. As the *Aloha* Court noted,

nowhere under the Federal Aviation Act is there any authority in the Board "to make a factual determination as to the existence *vel non* of all ingredients of an antitrust suit under the Sherman Act." 489 F.2d at 211 (emphasis in original). Similarly, the Court stated:

> The CAB could in no event have authorized by order the conduct which has been made the basis of the antitrust action. It goes without saying that the CAB could not, by any order entered by it, authorize overscheduling (which it found to exist) with "the predatory intent and purpose of eliminating plaintiff as a viable competitor" and "with full knowledge of its impact on plaintiff and with the intent of injuring or destroying plaintiff."

*Id.* at 211–12. No less can be said here. The Board has already taken action to stop the rebating practices in the sale of foreign air transportation and can not make any further determination on the existence *vel non* of elements of a Sherman Act violation. Nothing further by the C.A.B. would relieve this Court of or aid this Court in determining the facts in the antitrust suit. *See id.* at 212; *International Travel Arrangers v. Western Air Lines, Inc.*, 408 F.Supp. 431 (D.Minn.1975). *Cf. Mount Hood Stages, Inc. v. Greyhound Corp.*, 1973–2 Trade Cases ¶ 74,824 (D.Or.1973). *Compare Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

Moreover, there is nothing in this case which requires the particular expertise of the Board. A claim that a filed tariff is unreasonable in amount or unduly discriminatory in effect is a question that must, in the first instance, be determined by the agency with which the tariffs are filed. *See Danna v. Air France*, 463 F.2d 407, 409 (2d Cir. 1972); *Iberia Air Lines of Spain v. Nationwide Leisure Corp.*, 408 F.Supp. 221, 224 (E.D.N.Y.1976). Similarly, resort to the C.A.B. is required where it is necessary in construing a tariff "to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction." *United States Navigation Co. v. Cunard S.S. Co.*,

284 U.S. 474, 482, 52 S.Ct. 247, 249, 76 L.Ed. 408 (1932); *United States v. Western Pacific R.R.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Where, however, regardless of its complexity, the question is not the reasonableness of the rate or rule but a violation of such rate or rule, or the manner in which the tariff is applied, the doctrine of primary jurisdiction is inapplicable. *See C.A.B. v. Aeromatic Travel Corp.,* 489 F.2d 251, 253–54 (2d Cir. 1973); *Danna, supra* at 410, 412; *C.A.B. v. Modern Air Transport,* 179 F.2d 622, 624 (2d Cir. 1950). As was stated by Mr. Justice Lamar in *Pennsylvania R.R. v. Puritan Coal Mining Co.,* 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867 (1914):

> But if the carrier's rule, fair on its face has been unequally applied, and the suit is for damages occasioned by its violation or discriminatory enforcement, there is no administrative question involved, the courts being called on to decide a mere question of fact as to whether the carrier has violated the rule to plaintiff's damage.

*Id.* at 131–32, 35 S.Ct. at 488. *See Great Northern Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 290–91, 42 S.Ct. 477, 66 L.Ed. 943 (1921). The conduct herein falls within this exception since the mischief which forms the basis of the antitrust claims is that defendants have departed from their tariffs.

Finally, in the desire to avoid conflicting decisions by this Court and the C.A.B., *see DHL Corp. v. Loomis Courier Service, Inc.,* 522 F.2d 982, 985 (9th Cir. 1975), and thus, to assure uniform and consistent regulation of an industry subjected to a pervasive regulatory scheme, *see Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Nader v. Air Transport Association of America,* 426 F.Supp. 1035, 1043 (D.D.C.1977), the defendants urge that the present Board investigation, *see* C.A.B. Order 76–7–56 (July 16, 1976), requires this Court to stay its hand. With respect to this contention, the C.A.B., as *amicus curiae,* has strenuously argued that referral of the instant proceedings to the Board is unnecessary since the issues herein and those involved in the ongoing investigation do not overlap and thus, no order of the Court could create a conflict with the eventual results of said investigation. While the Court is not required to adopt the Board's position, this view is at least entitled to some weight. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 328, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (Brennan, J. dissenting).

Under the facts of this case, the Court must agree with the Board position. As stated in the Board order instituting the present investigation, "[t]he overriding issue before us namely, whether an agreement among international air carriers establishing *uniform rates* to be paid to their agents for the sale of air transportation, is or is not adverse to the public interest." C.A.B. Order, *supra* at 2 (emphasis supplied). Moreover, in defining the scope of the investigation the Order states:

> As stated, the one aspect of the agreements to be investigated is the controlling question of whether there is sufficient justification for approval of a uniform commission structure, as contrasted with allowing the commissions to be set by individual carriers in response to market forces. Our inquiry is limited to the sale of international air transportation but will include both passenger and cargo sales. The investigation is to consider the basic question as it is applicable to the agreements before us, but is not to consider any additional questions, although raised in the comments, such as the appropriate level of commission rates. There are of course, sub-issues to the central issue which must be explored. The sub-issues of the investigation should include, but not be limited to, such matters as:
>
> 1. Whether commission rates would climb excessively in the absence of a fixed uniform rate, and thus inflate fare levels, without any offsetting benefit such as increased promotion and travel demand;
>
> 2. Will agents lose their impartiality in dealing with the public under an open commission structure, so as to be gov-

erned primarily by the financial consideration of which carrier pays the highest commission in recommending travel arrangements;

3. What, if any, are the international implications of an open versus uniform commission structure; and

4. What are the immediately foreseeable implications for the structure of the travel agent industry under an open commission structure.

Additional sub-issues, and the most appropriate procedures to use to explore the questions, can be developed at a prehearing conference.

*Id.* at 8 (footnotes omitted). Finally, in a footnote to the Order it was stated:

The issue of whether the levels of the proposed commission rates are fair and equitable to all concerned is separate and distinct from the issue of whether the fixing of uniform rates of commissions to travel agents by agreement among the carriers is adverse to the public interest. The issue of whether the rate established should be 7 percent or 8 percent is unimportant from an antitrust viewpoint while the latter issue does raise antitrust questions.

*Id.* n.24 (footnotes omitted).

Thus, an examination of the Order and the scope of the Board investigation clearly supports the Board's position that the doctrine of primary jurisdiction is inapplicable. The instant litigation involves the alleged unlawful and discriminatory rebate system, which as previously noted, can not be approved by C.A.B. action and alleged antitrust violations which have occurred by virtue of those practices which, again as previously noted, the Board can not redress through an award of treble damages. Thus, the Court can not foresee any set of facts which could give rise to the possibility of conflicting decisions. *Compare DHL Corp., supra* at 985; *Danna, supra* at 412.

In conclusion, since the underlying activity allegedly practiced by defendants is unlawful under the Federal Aviation Act, could not be made lawful by the C.A.B. and has been specifically enjoined by C.A.B.

proceedings to the full extent of its jurisdiction, there is nothing further for the Board to consider. Resort to the doctrine of primary jurisdiction is, therefore, not necessitated. Moreover, the disposition of plaintiff's antitrust cause of action requires neither a special understanding of the air transportation industry, nor of any relevant circumstances generally unfamiliar to a judicial tribunal. Since the issue involves no economic policy consideration which would undermine the uniformity and consistency in the regulation of business entrusted to the Board, the doctrine of primary jurisdiction is inapplicable.

In light of the foregoing, it is ORDERED,

1. That defendants' motion to dismiss the first cause of action is granted;

2. That defendants' motion to dismiss the second cause of action is denied; and

3. That defendants' motion to dismiss the complaint on the ground that the Civil Aeronautics Board has primary jurisdiction of the subject matter is denied.